730 A.2d 239

Sharon E. CHASE, Personal Representative
of the Estate of Carlean Burley, et al.

v.

MAYOR AND CITY COUNCIL OF BALTIMORE, et al.

No. 677, Sept. Term, 1998.

Court of Special Appeals of Maryland.

May 26, 1999.

John Amato, IV (Goodman, Meagher & Enoch, LLP, Baltimore, on the brief.)

Timothy L. Mullin, Jr. (Stephen J. Cullen, Edward W. Brady and Miles & Stockbridge, P.C., Baltimore, on the brief.)

Argued before HARRELL, THIEME, and WILLIAM C. MILLER (retired, specially assigned), JJ.

HARRELL, Judge.

Appellants, Sharon E. Chase, personal representative of the estate of Carlean Burley, and Darlene Burley, guardian and next friend of Richard Sturdivant,[1] filed this action in the Circuit Court for Baltimore City against appellees, the Mayor and City Council of Baltimore ("the City"), and its employee, Kevin D. Williams, an emergency medical technician for the Baltimore City Fire Department.[2] Appellants alleged that on 1 March 1995, Mr. Williams, acting in his capacity as a paramedic for the Baltimore City Fire Department, negligently intubated Carlean Burley's esophagus, instead of her trachea, while attempting to resuscitate her during a cardiac arrest. Appellants alleged that the negligent intubation directly and proximately caused Carlean Burley's death.

---

1. Appellants alleged in their amended complaint that Richard Sturdivant, Ms. Carlean Burley's grandson, was financially dependent upon Ms. Burley at the time of her death.

2. Appellants did not allege in their amended complaint any independent factual allegations, claims, or counts against the City directly. Accordingly, any liability on the part of the City arises solely out of the doctrine of *respondeat superior*.

On 26 January 1998, appellees filed a motion for summary judgment on the bases that either of two Maryland statutes provided qualified immunity to Mr. Williams, acting as a Baltimore City Fire Department paramedic, and that appellants had not presented any evidence of gross negligence on the part of Mr. Williams to defeat such immunity. Appellants filed their opposition on 25 February 1998, arguing that appellees were not entitled to immunity under either statute. They further asserted that, assuming one or both of the statutes did provide immunity, appellants had generated a triable dispute of material fact on the issue of gross negligence, and therefore it was inappropriate for the court to dispose of the case on summary judgment. Following a hearing on 9 March 1998, the circuit court ruled that both statutes applied and granted immunity to Mr. Williams, and therefore the immunity applied vicariously to the City. The court further ruled that the facts as alleged could not support a finding that Mr. Williams's actions amounted to gross negligence. Accordingly, the court entered judgment in favor of appellees on 11 March 1998.

Appellants filed this timely appeal. They presented the following questions for our review, which we have reorganized and rephrased slightly:

I. Whether the circuit court erred when it held that the "Good Samaritan Act," Md.Code (1973, 1998 Repl. Vol.), § 5–603 of the Courts and Judicial Proceedings Article, granted Mr. Williams qualified immunity and required appellants to prove gross negligence, despite the fact that the City charged for the services rendered to the deceased.

II. Whether the circuit court erred when it held that the "Fire and Rescue Company Act," Md.Code (1973, 1998 Repl.Vol.), § 5–604 of the Courts and Judicial Proceedings Article, applied to grant immunity to City fire department personnel.

III. Whether the circuit court erred when it held as a matter of law that Mr. Williams' actions did not

amount to gross negligence despite expert opinion evidence to the contrary.

### FACTS [3]

On 1 March 1995, at approximately 2:00 a.m., Carlean Burley, age 66, telephoned her daughter, Irma Jones, and said that she was not feeling well. Ms. Jones went to Ms. Burley's house, located at 314 North Hilton Street, Baltimore, Maryland. When she arrived, Ms. Burley was complaining of shortness of breath. Other family members arrived shortly thereafter and placed a 911 call. Contact was made with Baltimore City Medic Unit No. 12 at 2:53 a.m. The ambulance departed the station house at 2:55 a.m., and arrived at 314 North Hilton Street at 2:57 a.m. A fire engine unit, Engine 30, also responded to the call, as was apparently customary.

Upon arrival at Ms. Burley's home, Mr. Williams and Baltimore City Fire Fighter Tyrone Morris, the driver of the ambulance, conducted an initial assessment of Ms. Burley by checking her respiration, pulse rate, and level of consciousness. Mr. Williams placed Ms. Burley on oxygen, put her on a stretcher, and put her into the ambulance for transport to St. Agnes Hospital. An EKG was taken and an IV was started.

Mr. Williams next completed a second assessment of Ms. Burley's pulse and respiratory rates. He concluded preliminarily that Ms. Burley was in respiratory distress and was suffering from pulmonary edema. Mr. Williams then contacted the hospital by radio for a physician consultation. After completing the consultation and releasing Fire Engine Unit 30 from the scene, Mr. Williams noticed at 3:10 a.m. that Ms. Burley had become unconscious. He determined that she had gone into cardiac arrest, had no pulse, and needed cardio-

---

3. The facts are gleaned from deposition testimony, affidavits, and documentary exhibits. Unless we explicitly state to the contrary, the facts recited are not in genuine dispute within the meaning of Md. Rule 2–501.

pulmonary resuscitation ("CPR"), medication, and immediate intubation.[4] He then called Fire Engine Unit 30 back to the scene to assist him with these services.[5].

When Engine 30 returned to the scene, Mr. Williams intubated Ms. Burley in the ambulance. He testified during his deposition hearing as to the following: first, he readied Ms. Burley for intubation and prepared the medical instruments for the procedure. He then used a laryngoscope to sweep the patient's tongue and visualize the vocal cords.[6] Visualizing the cords, he inserted the tube through the cords and then checked for breath sounds in the lungs and abdomen to assess that he had placed the tube in its proper place in the windpipe. Finally, he secured the tube in place [7] and departed for the hospital at 3:20 a.m. He re-checked the tube one time after departing for the hospital by listening with his stethoscope for breath sounds in the lungs and abdomen. He claimed that during that time, although he checked the epigastric area for breath sounds, he did not hear any.[8] He did not recheck the tube at any other point during the transport to the hospital, nor upon reaching the hospital.

---

**4.** As Ms. Burley also was in respiratory distress, intubation was necessary to allow her to breathe.

**5.** In order to allow Mr. Williams and Mr. Morris to continue the effective administration of CPR, Engine 30 was recalled to the scene to provide extra assistance to the paramedics as well as to supply an individual to drive the ambulance while the two paramedics tended to Ms. Burley. Additionally, Mr. Williams needed two qualified emergency medical technicians to continue CPR while he intubated Ms. Burley.

**6.** Appellants disputed Mr. Williams's account of the procedures he employed to intubate Ms. Burley, whether he visualized the vocal cords and the tube passing through the cords, and whether he verified correctly and accurately that result.

**7.** Mr. Williams could not recall whether he had secured the tube in place with H-tape or with a holder. At some point he also gave Ms. Burley Epinephrine for her cardiac status, but could not remember exactly when this occurred.

**8.** Breath sounds noted in the epigastric area would indicate that intubation of the esophagus, rather than the trachea, had been accomplished.

The ambulance arrived at St. Agnes Hospital at 3:25 a.m. Mr. Williams maintained ventilation of Ms. Burley while others removed the stretcher carrying Ms. Burley from the ambulance. He then turned the patient over to hospital personnel. Kevin Scruggs, M.D., attended Ms. Burley upon her arrival in the emergency room. He submitted an affidavit, attached to appellants' response to appellees' motion for summary judgment, stating that he heard breath sounds over Ms. Burley's epigastrium [9] and that his CO2 (carbon dioxide) [10] detector showed no reading. He reintubauted Ms. Burley and confirmed proper placement of the new tube using the CO2 detector. Ms. Burley was then admitted to the hospital's Coronary Care Unit. She died the next morning, 2 March 1995, at 11:05 a.m. The death certificate states the immediate cause of death as acute myocardial infarction, as a consequence of coronary artery disease, as a consequence of non-insulin dependent diabetes. Allegations in the complaint, and in an affidavit of Frederick E. Kuhn, MD, who attended Ms. Burley upon her admission to the Coronary Care Unit, state the myocardial infarction was aggravated due to anoxic encephalopathy, or lack of oxygen to the brain.

Additional factual background will be supplied as necessary in the discussion of appellant's issues.

### STANDARD OF REVIEW

In reviewing a lower court's grant of summary judgment, the standard is simply whether that court was correct as a matter of law. *Beatty v. Trailmaster Prods., Inc.,* 330 Md. 726, 737, 625 A.2d 1005 (1993). *See also Heat & Power Corp. v. Air Prods. & Chems., Inc.,* 320 Md. 584, 591, 578 A.2d 1202 (1990); *King v. Bankerd,* 303 Md. 98, 111, 492 A.2d 608 (1985). A grant of summary judgment is proper when the movant clearly has demonstrated the absence of any genuine issue of

---

**9.** The epigastrium is located in the upper-middle region of the abdomen.

**10.** Carbon dioxide is a by-product of the respiratory process.

material fact and that he or she is entitled to judgment as a matter of law. Md. Rule 2–501(e); *Castiglione v. Johns Hopkins Hosp.*, 69 Md.App. 325, 332, 517 A.2d 786 (1986). "The court must consider 'the pleadings, depositions, answers to interrogatories, admissions and affidavits' submitted by the parties . . . . In determining whether a factual dispute exists, all inferences are to be drawn in the light most favorable to the nonmoving party." *Castiglione*, 69 Md.App. at 332, 517 A.2d 786 (citation omitted).

## DISCUSSION

Our immediate tasks in this case involve statutory construction. In *Edgewater Liquors, Inc. v. Liston*, 349 Md. 803, 709 A.2d 1301 (1998), the Court of Appeals stated:

"In construing the meaning of a word in a statute, the cardinal rule is to ascertain and carry out the real legislative intention." *Tucker v. Fireman's Fund Ins. Co.*, 308 Md. 69, 73, 517 A.2d 730 (1986); *see also Marriott Employees Fed. Credit Union v. Motor Vehicle Admin.*, 346 Md. 437, 444, 697 A.2d 455 (1997); *Romm v. Flax*, 340 Md. 690, 693, 668 A.2d 1 (1995). Legislative intent generally is derived from the words of the statute at issue. "We are not constrained, however, by . . . 'the literal or usual meaning' of the terms at issue." "Furthermore, we do not read statutory language 'in isolation or out of context [but construe it] in light of the legislature's general purpose and in the context of the statute as a whole.' "

In analyzing a statute, we approach statutory construction from a common sense perspective. Accordingly, we avoid construing a statute so as to lead to results that are unreasonable, illogical, or inconsistent with common sense.

*Id.* at 807–808, 709 A.2d 1301 (some citations omitted).

Additionally, the Court of Appeals cautions:

The plain-meaning rule does not force us to read legislative provisions in rote fashion and isolation.

When we pursue the context of statutory language, we are not limited to the words of the statute as they are

printed in the Annotated Code. We may and often must consider other "external manifestations" or "persuasive evidence," including a bill's title and function paragraphs, amendments that occurred as it passed through the legislature, its relationship to earlier and subsequent legislation, and other material that fairly bears on the fundamental issue of legislative purpose or goal, which becomes the context within which we read the particular language before us in a given case.

. . . Thus, in *State v. One 1983 Chevrolet Van*, 309 Md. 327, 524 A.2d 51 (1987) . . . . [a]lthough we did not describe any of the statutes involved in that case as ambiguous or uncertain, we did search for legislative purpose or meaning—what Judge Orth, writing for the Court, described as "the legislative scheme" . . . . *See also Ogrinz v. James*, 309 Md. 381 [, 390, 524 A.2d 77] (1987), in which we considered legislative history (a committee report) to assist in construing legislation that we did not identify as ambiguous or of uncertain meaning.

*Kaczorowski v. Mayor and City Council of Baltimore*, 309 Md. 505, 514–15, 525 A.2d 628 (1987).

Furthermore, this Court, in *Barr v. Barberry Bros., Inc.*, 99 Md.App. 33, 40, 635 A.2d 64 (1994), noted that "when substantive changes are made it indicates an 'intent to change the meaning of that statute.' We also perceive that the opposite, *i.e.*, no substantive change, reflects a legislative intent that the meaning of the statute is *not* meant to be changed." (quoting *C & R Contractors v. Wagner*, 93 Md.App. 801, 809, 614 A.2d 1035 (1992)).

## I. THE GOOD SAMARITAN ACT

With these principles in mind, we turn to the first qualified immunity statute pointed to by appellees and relied on by the circuit court in its grant of summary judgment. Maryland Code (1973, 1998 Repl.Vol.), § 5–603 of the Courts and Judicial Proceedings Article (The Good Samaritan Act), states in pertinent part:

(a) A person described in subsection (b) of this section is not civilly liable for any act or omission in giving any assistance or medical care if:

(1) The act or omission is not one of gross negligence;

(2) The assistance or medical care is provided without fee or other compensation; and

(3) The assistance or medical care is provided:

(i) At the scene of an emergency;

(ii) In transit to a medical facility; or

(iii) Through communications with personnel providing emergency assistance.

(b) Subsection (a) of this section applies to the following . . .

(2) A member of any State, county, municipal, or volunteer fire department, ambulance and rescue squad . . . if the member . . .

(iii) Is certified or licensed by this State as an emergency medical services provider. . . .

The circuit court, in ruling on the motion for summary judgment, stated:

It is the opinion of the Court, that both statutes apply. The paramedics, in this case, are employees of the Mayor & City Council and it is that entity that assesses a fee, if any, for the services rendered by them. The fact that a paramedic here was paid a salary, does not remove him from the protections of the "Good Samaritan Act" as found in Section 5–603, of the Courts and Judicial Proceedings Article.

Appellants argue that the Good Samaritan Act does not afford immunity in this case to Mr. Williams, and therefore the City, because, on 20 May 1995, the City of Baltimore directed a bill to Ms. Burley in the amount of $100 for "Ambulance Service—Advanced Life Support Transport" rendered on 1 March 1995. This charge, appellants argue, is contrary to subsection (a)(2) of the Act and removes the potential immunity from this case. Appellees asserted, below and in their brief to this Court, four opposing arguments: (1) that Mr. Williams, the party seeking immunity under the

statute, did not charge the fee; rather, the fee was charged by the City, against whom there are no claims other than vicarious liability for the allegedly negligent acts of Mr. Williams; (2) that the fee charged by the City was not for assistance or medical care within the meaning of the statute, but rather, it was for "advanced life support *transportation*" (emphasis added); (3) that the fee charged by the City does not cover fully the City's expenses in providing such emergency services, nor does it result in a profit; therefore the charge is not the type of fee contemplated by the statute; and, (4) that the fee was not paid by Ms. Burley, her estate, or her survivors. For the following reasons, we agree with appellants and conclude that the trial court erred when it held that the Good Samaritan Act statute granted any immunity to Mr. Williams or his employer.

We first address appellees' argument that the $100 fee was not charged by Mr. Williams, the person asserting the immunity, but rather was charged by the City. Appellees support their argument with this Court's decision in *Tatum v. Gigliotti*, 80 Md.App. 559, 565 A.2d 354 (1989), *aff'd*, 321 Md. 623, 583 A.2d 1062 (1991). In *Tatum*, we considered the 1981 codification of the Good Samaritan Act, which provided, in part, "[a] person licensed by the State ... who renders medical aid, care, or assistance *for which he charges no fee or compensation* ... is not liable for any civil damages...." Md.Code (1981), Art. 43, § 132(a) (emphasis added) (recodified as amended at Md.Code (1973, 1998 Repl.Vol.), § 5–603(a)(2) of the Courts and Judicial Proceedings Article). *Tatum* concerned whether an emergency medical technician's receipt of a salary destroyed his immunity under the "charges no fee or compensation" provision of the statute. Holding that it did not, we focused on the act of charging a fee to the victim, rather than the direct provider's receipt of compensation in the way of salary for being available to provide and actually providing those services. In summarizing our ruling, we stated, "[w]e hold, then, that absent a charge to the victim by the person who is seeking immunity, salaried personnel do not receive 'compensation' within the meaning of this section."

*Tatum,* 80 Md.App. at 568, 565 A.2d 354. Appellees point to this specific language as support for their argument that immunity is defeated only if the charge to the victim is rendered *by the person who is seeking immunity;* therefore, because Mr. Williams, the person asserting immunity here, did not charge the fee, the application of the statutory immunity is not defeated.

Before addressing the merits of appellees' argument, we pause here to distinguish this specific language in *Tatum* from the situation presented by the instant case. The pertinent language of Md.Code (1981), Art. 43, § 132(a), was changed in 1982 to reflect the language currently employed: "The assistance or medical care is provided *without fee or other compensation.*" (Emphasis added). *See* 1982 Laws of Maryland, ch. 770. The acts in *Tatum* occurred prior to this statutory change, and, accordingly, our decision was couched in the language of the appropriate codification. To date, no Maryland case has addressed the significance of the 1982 change in the statutory language. We choose to do so, *infra,* and do not rely on *Tatum* for this task.

Turning to the merits of appellees' argument, we find it to be unpersuasive. Because paramedics such as Mr. Williams are employees of the City, a situation could never arise in which paramedics personally charged members of the public requiring their assistance for medical services provided. Rather, the City's Treasury Department and/or accounts collection division would render the bills for charges for such services. Therefore, the reverse situation necessarily contemplated by appellees' argument, namely, that if an employee charges a fee for services rendered, the employee would lose his immunity under the statute but the employer would retain its immunity, is not a practical scenario. Accordingly, although appellees' argument apparently assumes that the immunities for employer and employee are severable, we decline to consider it further as it is entirely too academic.

Appellees also argue that the fee charged by the City was (1) a token fee to cover transportation costs and (2) not

the type of fee contemplated by the statute, as it did not result in a profit. We note initially that the plain language of § 5–603(a)(2) does not distinguish between a "token fee" and a fee "for profit," and therefore appellees' argument fails on that basis. In further examining the argument, however, we consider Baltimore City Code, Art. 9, § 12A (Supp.1995), which provides the City's Board of Fire Commissioners with the authority to "charge fees to any member of the public who utilizes ambulance services provided by the emergency medical services division of the Fire Department within the City of Baltimore." Subsection (1) further provides: "The initial fee charged shall not exceed: For basic life support transport . . . $75.00. For an advanced life support transport . . . $100." Subsection (2) provides:

(2) Definitions:

"Basic life support transport" means transportation provided to sustain and support the life processes and change the outcome of a life-threatening disease or injury for patients who must be transported for hospital care.

"Advanced life support transport" means transportation provided to enhance the successful outcome of an unstable patient with a life-threatening disease or injury *by use of invasive drug therapy* and who needs immediate transportation to a hospital or specialty center.

(Emphasis added). Accordingly, the City ordinance definition of "advanced life support" contemplates the potential provision of some form of medical assistance or service in addition to the mere act of transporting a patient to a medical facility.

Additionally, we find persuasive the following reasoning from 80 Op. Att'y Gen. No. 95–020 (June 9, 1995), addressing whether a proposed City of Annapolis ordinance, establishing fees for ambulance services provided by the Annapolis Fire Department and similar to the Baltimore City ordinance in this case, would jeopardize the immunity provided under substantively the same version of the Good Samaritan Act as prevails in the instant case. In advising that the imposition of a fee on the victim for emergency assistance and medical care

would result in the loss of immunity, the Attorney General stated:

> There are significant conceptual and practical problems in attempting to distinguish between a fee for the use of an ambulance as a mode of transportation and a fee for "assistance or medical care." When emergency medical services personnel respond to an emergency call, they provide both "medical care" to stabilize the victim and "assistance" in the form of fast transportation to an emergency room or trauma center. The very act of transporting a victim in an emergency appears to be "assistance" that is to be rendered "without fee or compensation."

Accordingly, because the very fact that emergency medical services involve transport to the nearest hospital belies the assertion that mere "transport" costs are not within the purview of medical services, we hold that the statute does not provide an exception for the fee charged by the City in this case.[11]

 Finally, appellees argue that because the fee was never paid by Ms. Burley or her survivors, the services were, in effect, rendered without fee or compensation. We disagree. The Good Samaritan Act was created by 1963 Laws of Maryland, ch. 65, and codified at Md.Code (1957, 1963 Cum.Supp.), Art. 43, § 149A. Its original language applied only to licensed physicians, and granted them immunity from civil liability in the absence of gross negligence when they, "in good faith, render[ed] medical aid, care, not in a hospital, and assistance *for which the physician received no fee or compensation,* at the scene of an accident...." (Emphasis added). In 1964, the statute was amended to allow for the immunity of qualifying members of volunteer ambulance and rescue squads. 1964 Laws of Maryland, ch. 48; Md.Code (1957, 1964 Cum.Supp.),

---

11. We are mindful of the potential public policy implications of a ruling that "no fee equals no fee," even for recouping transportation costs (the City, for example, may choose to transfer the additional costs to the taxpayers). Nevertheless, we believe this is better left for resolution in a legislative or executive branch venue.

Art. 43, § 149A(b). In 1965, coverage was extended to registered nurses and licensed practical nurses. 1965 Laws of Maryland, ch. 475. In 1969, coverage was extended to members and employees of volunteer fire departments. 1969 Laws of Maryland, ch. 616.

In 1970, the statute was revised and renumbered as § 132 of Article 43. The compensation language of subsection (a) was amended to read: "for which he *charges* no fee or compensation." (Emphasis added). The statute was amended a number of times between 1970 and 1982 to extend its scope to a larger group of emergency personnel. In 1982, it was renumbered as § 5–309 of the Courts and Judicial Proceedings Article and further amended to resemble its current codification, which provides immunity for assistance or medical care *"provided without fee or other compensation."* 1982 Laws of Maryland, ch. 770 (emphasis added); *see also supra* at p. 438.

These amendments appear to reflect a conscious decision by the General Assembly to change the perspective of what constitutes a "good samaritan" from the vantage point of the person receiving the fee or compensation to that of the person charged for the emergency services. In other words, the "fee" provision of the statute is not to be assessed from the standpoint of the provider, but that of the victim. Therefore, the question becomes not whether the fee was received by the provider of services, but whether the fee was *charged to* the recipient of such services. Accordingly, that the fee was never paid by Ms. Burley or her survivors is not dispositive; the mere fact that Ms. Burley was charged for the emergency services suffices to eviscerate the immunity claimed in this case under the Good Samaritan Act statute.

We hold that the circuit court erred when it ruled that the Good Samaritan Act applied to grant qualified immunity to Mr. Williams and, therefore, to the City.

## II. THE FIRE AND RESCUE COMPANY ACT

In holding that the "Fire and Rescue Company Act" provided an additional or independent basis for Mr. Williams'

claim of qualified immunity in this case, the circuit court stated that "the Legislature included and intended to include Municipal Fire Departments which, in this case, is [sic] represented by the Baltimore City Fire Department." Appellants argue that the Act applies only to volunteer and private fire and rescue companies and their personnel, and not to city or municipal fire departments or paramedic personnel. For the following reasons, we agree with appellants.

Maryland Code (1973, 1998 Repl.Vol.), § 5–604 of the Courts and Judicial Proceedings Article (The Fire and Rescue Company Act), provides, in pertinent part:

(a) *Immunity from Civil Liability.*—Notwithstanding any other provision of law, except for any willful or grossly negligent act, a fire company or rescue company, and the personnel of a fire company or rescue company, are immune from civil liability for any act or omission in the course of performing their duties.

In the context of deciding whether to apply this Act retroactively to conduct which occurred before the Act's effective date, the Court of Appeals summarized the legislative history of the Act:

Courts & Judicial Proceedings Art. § 5–309.1 [recodified at § 5–604] was Senate Bill 731 of the 1983 Session of the General Assembly. The file of the Senate Judicial Proceedings Committee on S.B. 731 reflects that the legislation was a response to *Utica Mutual Insurance Co. v. Gaithersburg–Washington Grove Fire Department, Inc.*, 53 Md.App. 589, 455 A.2d 987 (1983). *Utica Mutual* was a negligence action brought by a fire insurance company, as subrogee of its insured, against a fire company for alleged negligence in failing properly to extinguish a fire which later reignited leading to a second fire. The circuit court had held that the fire company enjoyed governmental immunity but the Court of Special Appeals reversed, holding that whether a fire company enjoyed governmental immunity was a question of fact on which the fire company in *Utica Mutual* had failed to produce sufficient evidence. The intermediate appellate

court decided *Utica Mutual* on February 2, 1983, and on February 3, 1983, a member of the Maryland Senate requested the Department of Legislative Reference to prepare a bill granting immunity to volunteer firefighters. As introduced the bill provided that "[a] volunteer fire company is immune from liability in the same manner as a local government agency for any act or omission in the course of performing its duties if [ ] the act or omission is not one of gross negligence...." The bill was amended in the course of passage to its present form.

*Washington Suburban Sanitary Comm'n v. Riverdale Heights Volunteer Fire Co., Inc.*, 308 Md. 556, 569, 520 A.2d 1319 (1987).

Although the term "volunteer" was not included in the final form adopted by the General Assembly, this alone does not presume that the legislature intended to extend the immunity to state, county, or municipal fire departments. *See* 80 Op. Att'y Gen. No. 95–020 (June 9, 1995) (discussing legislative history and significance of the deletion of the term "volunteer;" noting that language of the enacted bill relating to the negligent operation of motor vehicles suggests a focus on non-governmental fire and rescue companies).

Additionally, appellants point out in their brief that when the Fire and Rescue Company Act was enacted in 1983, City paramedics and firefighters providing emergency medical care or assistance were already afforded immunity under the Good Samaritan Act, where applicable. Although the Good Samaritan Act limited the immunity to acts provided "without fee or other compensation," the City of Baltimore did not have the authority to charge such fees until 1 July 1989. *See* Baltimore City Code, Art. 9, § 12A (1995 Supp.). Therefore, it would have been redundant for the legislature in 1983 to create a second basis of immunity for municipal firefighters or paramedics rendering emergency medical care or assistance. Further, if the General Assembly did not intend for the Fire and Rescue Company Act to cover emergency medical situations, but rather the situation specifically contemplated by *Utica Mutual*, its application to municipal fire departments

would circumvent the fee restriction imposed by the Good Samaritan Act. We shall not read these statutes to produce such an inconsistent result.

Accordingly, we hold that Maryland Code (1973, 1998 Repl. Vol.), § 5–604 of the Courts and Judicial Proceedings Article, does not apply to municipal fire and rescue departments.

### III. GROSS NEGLIGENCE

Because the circuit court held that both the Good Samaritan Act and the Fire and Rescue Company Act granted qualified immunity to Mr. Williams, and vicariously, the City, it proceeded to address whether the facts alleged created a triable issue of gross negligence so as to defeat that statutory immunity. In the absence of the applicability of the statutes, however, the proper inquiry is whether the facts as alleged created a triable claim of ordinary negligence. As that issue was not before or considered by the trial court in the instant summary judgment proceeding, we need not consider the appellate arguments regarding gross negligence and shall remand this case for further proceedings.

JUDGMENT REVERSED; CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY; APPELLEES TO PAY THE COSTS.