THERESA S. HATCHER, APPELLANT, V. BELLEVUE
VOLUNTEER FIRE DEPARTMENT, APPELLEE.
628 N.W. 2d 685

Filed June 22, 2001.   No. S-00-197.

Thomas F. Hoarty, Jr., and Scott A. Calkins, of Byam &
Hoarty, and John K. Green for appellant.

Tim Engler and Dana M. Van Beek, of Harding, Shultz & Downs, for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

STEPHAN, J.

Dr. Theresa S. Hatcher brought this civil action for damages against the Bellevue Volunteer Fire Department (BVFD), based upon separate theories of intentional interference with a business relationship and conspiracy. Hatcher appeals from an order of the district court for Sarpy County entering summary judgment in favor of BVFD. She contends that contrary to the holding of the district court, BVFD is not immune from suit under the Political Subdivisions Tort Claims Act, Neb. Rev. Stat. §§ 13-901 to 13-926 (Reissue 1997), and that there is a genuine issue of material fact regarding whether BVFD tortiously interfered with her business relationship with Nebraska Emergency Consultants, P.C. (NEC). We conclude that BVFD is immune from suit under the act and therefore affirm the judgment of the district court.

## I. BACKGROUND

Evidence submitted by the parties with respect to the motion for summary judgment discloses the following facts: Dr. Michael Westcott is the sole shareholder of NEC, a professional corporation which provides physician emergency room services to Midlands Community Hospital (Midlands Hospital) in Papillion, Nebraska. Hatcher entered into a written employment agreement with NEC in May 1991 and was employed by that entity as an emergency room physician at Midlands Hospital until the employment agreement was terminated by Westcott on April 15, 1998. Westcott took this action pursuant to a provision in the agreement authorizing termination without cause upon 60 days' prior written notice.

BVFD is a nonprofit corporation, organized and existing under the laws of the State of Nebraska. BVFD provides fire protection and rescue services to residents of the city of Bellevue and to portions of rural Sarpy County. All of the members of BVFD are employed by other entities or are retired. No member is required to respond to rescue calls. The city of

Bellevue owns all of the fire equipment and buildings utilized by BVFD, and all of BVFD's operating funds come from the city of Bellevue. There is no written contract between BVFD and the city of Bellevue. Pursuant to its bylaws, BVFD controls the means and manner of its provision of services. BVFD answers approximately 1,600 rescue calls per year and, on 75 to 80 percent of these calls, transports patients to Midlands Hospital. BVFD charges $100 for each rescue call and uses this revenue to fund a "Length of Service Awards Program." This program entitles members who have served as volunteers for 20 years and who have reached the age of 60 to receive payments of $100 per month. Additional payments can be received for years of service exceeding 20 years, with a maximum monthly benefit of $150. BVFD members also receive reimbursement for training expenses but receive no other form of compensation.

From 1993 to 1998, Hatcher served as medical director of BVFD in addition to her duties with NEC. In approximately November 1997, a question arose concerning morphine allegedly missing from the rescue squad supplies of BVFD. Extensive investigations by state and federal authorities determined that no morphine was actually missing, but that BVFD personnel had not followed state and federal regulations in the restocking and resupplying of morphine. Hatcher, in her role as medical director of BVFD, was substantially involved in these investigations. The investigations garnered local publicity in November 1997.

In early 1998, Hatcher met with BVFD fire chief Steven Betts regarding the appropriate discipline to be imposed upon three BVFD officers found to be generally responsible for the morphine recordkeeping discrepancies. Hatcher proposed placing letters of discipline in the personnel files of the three officers, and she independently drafted a letter in that regard. In March 1998, the disciplinary letters were given to the three officers at Hatcher's direction. The recipients of the letters were upset at receiving the discipline, and Betts believed that the letters were unnecessary.

On March 6, 1998, Betts notified Hatcher that she was terminated from her position as medical director of BVFD. Dale Tedder and Mike Almsteier, in their capacities as assistant fire chief and rescue chief of BVFD, respectively, also approved the

termination. According to Betts, the termination was based at least in part upon the issuance of the disciplinary letters.

Hatcher wrote a letter to the mayor of Bellevue on April 3, 1998, outlining the actions of BVFD with respect to the morphine incident, the disciplinary letters, and the termination of her relationship with BVFD. Hatcher averred that this letter was written in her capacity as former medical director of BVFD and as a member of the Bellevue City Council. Sometime between April 4 and 14, the Bellevue Leader, a local newspaper, obtained a copy of Hatcher's letter to the mayor and contacted both Hatcher and Betts. The newspaper published a story regarding Hatcher's termination in its Wednesday, April 15, edition, which first appeared on the evening of April 14. The article was entitled "Hatcher quits BVFD over morphine discipline spat" and was based upon statements Hatcher made to the newspaper and the contents of her letter to the mayor. The article and Hatcher's letter were generally critical of BVFD. Hatcher averred that on the evening the article was published, she received a telephone call from Betts informing her that he was upset about the article and that it was a "career ending move" for her. A former member of BVFD also averred that Betts had stated the incident was a career-ruining event for Hatcher. Betts testified he did not recall discussing the newspaper article with Hatcher.

Prior to the publication of this article, Westcott had contacted Betts to arrange a meeting for later in the month of April. Westcott requested the meeting because he felt there was some ill will between Midlands Hospital, NEC, and BVFD due to the circumstances surrounding the termination of Hatcher's relationship with BVFD. It was also the customary practice for Midlands Hospital personnel to meet with a new fire chief, and Betts had recently been appointed to that position. On April 15, 1998, the morning the article appeared in the Bellevue Leader, Betts telephoned Westcott and requested that the meeting be held "sooner instead of later." The meeting was then rescheduled for that same day.

The meeting took place in a conference room at Midlands Hospital. Those present included Westcott, Betts, Tedder, and Almsteier. Diana Smalley, the administrator of Midlands Hospital, and Toni Regni, Midlands Hospital's chief nurse, were

also in attendance. The individuals present at the meeting testified generally that there was some discussion during the meeting regarding the morphine incident and resulting disciplinary action, with BVFD personnel stating their "side" of these events. Smalley testified that she asked if BVFD was asking that Hatcher be terminated from her position on the Midlands Hospital staff and that Betts responded "absolutely not, that is not our role."

Westcott terminated Hatcher's employment agreement with NEC on the same day as the meeting. Westcott testified that he did not recall anyone at the meeting suggesting that Hatcher be terminated and that none of the information he received from the firefighters played any part in his decision to terminate Hatcher. He testified that he alone made the decision because of his concern about Hatcher's work habits and NEC's reputation.

Hatcher filed this action naming BVFD as the sole defendant. In her operative amended petition, Hatcher alleged that "by and through its Fire Chief, Assistant Fire Chief and Rescue Chief," BVFD tortiously interfered with her business relationship with NEC. In a separate claim for relief, she alleged that BVFD "conspired with its Fire Chief, Assistant Fire Chief and Rescue Chief, and others, to damage [Hatcher] by persuading NEC to terminate [her] employment." BVFD moved to strike the phrase "and others" in the conspiracy allegation or, in the alternative, to make the allegation more definite and certain by identifying the persons with whom it allegedly conspired. The court granted the motion to strike and ordered the phrase "and others" stricken from the amended petition. BVFD then filed an answer to the amended petition, asserting defenses that the petition failed to state a cause of action and that Hatcher's claim was barred by Nebraska's Political Subdivisions Tort Claims Act.

BVFD subsequently filed a motion for summary judgment. After a hearing at which various affidavits and depositions were received in evidence, the district court entered an order on January 25, 2000, granting the motion for summary judgment. The court concluded that there was no material issue of fact with regard to whether BVFD engaged in an " 'unjustified intentional act of interference' " and further noted its "concern" that the Political Subdivisions Tort Claims Act barred the suit. The order did not specifically address Hatcher's conspiracy claim.

Hatcher filed this timely appeal which we removed to our docket on our own motion pursuant to our authority to regulate the dockets of the appellate courts. See Neb. Rev. Stat. § 24-1106(3) (Reissue 1995).

## II. ASSIGNMENTS OF ERROR

Hatcher assigns, restated, that the district court erred (1) in determining as a matter of law that BVFD did not tortiously interfere with her contractual relationship with NEC, (2) in determining that BVFD is an agent or employee of the city of Bellevue and therefore immune from suit pursuant to the Political Subdivisions Tort Claims Act, (3) in striking the phrase "and others" from the conspiracy theory cause of action alleged in her amended petition, (4) in failing to allow her leave to amend her petition after the motion to strike was granted, and (5) in failing to address her conspiracy cause of action.

## III. STANDARD OF REVIEW

Summary judgment is proper only when the pleadings, depositions, admissions, stipulations, and affidavits in the record disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. *Allstate Ins. Co. v. LaRandeau,* 261 Neb. 242, 622 N.W.2d 646 (2001). In reviewing a summary judgment, an appellate court views the evidence in a light most favorable to the party against whom the judgment is granted and gives such party the benefit of all reasonable inferences deducible from the evidence. *Bates v. Design of the Times, Inc.,* 261 Neb. 332, 622 N.W.2d 684 (2001).

Statutory interpretation presents a question of law, in connection with which an appellate court has an obligation to reach an independent conclusion irrespective of the decision made by the court below. *Tilt-Up Concrete v. Star City/Federal,* 261 Neb. 64, 621 N.W.2d 502 (2001).

## IV. ANALYSIS

### 1. TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIP

Hatcher's claim for intentional interference with a business relationship is based solely upon allegations that during the April 1998 meeting at Midlands Hospital, BVFD "by and

through" Betts, Tedder, and Almsteier induced Westcott to terminate her employment agreement with NEC. By way of affirmative defense, BVFD alleged that Betts, Tedder, and Almsteier have immunity under the Political Subdivisions Tort Claims Act because of their status as volunteer firefighters and that such immunity extends to BVFD.

We begin our examination of this issue by reference to the pertinent provisions of the act. Section 13-902 provides that

> no political subdivision of the State of Nebraska shall be liable for the torts of its officers, agents, or *employees*, and that no suit shall be maintained against such political subdivision or its officers, agents, or *employees* on any tort claim except to the extent, and only to the extent, provided by the Political Subdivisions Tort Claims Act.

(Emphasis supplied.) "Employee of a political subdivision" is defined by the act as

> any one or more officers or employees of the political subdivision or any agency of the subdivision and shall include members of the governing body, duly appointed members of boards or commissions when they are acting in their official capacity, *volunteer firefighters*, and volunteer rescue squad personnel. Employee shall not be construed to include any contractor with a political subdivision.

(Emphasis supplied.) § 13-903(3). We have stated that the act reflects a limited waiver of governmental immunity and prescribes the procedure for maintenance of a suit against a political subdivision. *Schoemaker v. Metropolitan Utilities Dist.*, 245 Neb. 967, 515 N.W.2d 675 (1994). BVFD's immunity claim rests upon the premise that the individual actors were "volunteer firefighters" and therefore "employees of a political subdivision" within the meaning of the act. Hatcher challenges both aspects of this premise.

### (a) Are BVFD Members "Volunteer Firefighters"?

#### (i) Volunteer Status

Initially, Hatcher makes three arguments attacking the status of BVFD members as "volunteer firefighters." First, she contends BVFD members are not "volunteers" because they receive compensation for their services. This argument is based upon

evidence that BVFD charges citizens $100 per rescue call and uses the moneys collected to fund a deferred compensation program for members who reach a certain age and length of service. The record reflects that BVFD members who reach the age of 60 and who have served for 20 years receive $100 to $150 monthly pursuant to a length of service plan instituted by BVFD and funded by the $100-per-rescue-call charge.

■ The term "volunteer" is not defined by the Political Subdivisions Tort Claims Act. Notably, however, in the absence of anything to the contrary, statutory language is to be given its plain and ordinary meaning; an appellate court will not resort to interpretation to ascertain the meaning of statutory words which are plain, direct, and unambiguous. *Jones v. Paulson*, 261 Neb. 327, 622 N.W.2d 857 (2001). The Court of Appeals has generally defined the plain meaning of "volunteer" to be "someone who performs services without expecting to be paid." *Thomas v. Kearney Little League Baseball Assn.*, 5 Neb. App. 405, 407, 558 N.W.2d 842, 844 (1997).

A similar definition of "volunteer" is utilized in application of the federal Fair Labor Standards Act to employees of state and local governments. See 29 C.F.R. § 553.101(a) (2000). The federal regulations define "volunteer" as "[a]n individual who performs hours of service for a public agency for civic, charitable, or humanitarian reasons, without promise, expectation or receipt of compensation for services rendered . . . ." *Id.* The regulations further provide that an individual's volunteer status is unaffected by the reimbursement of expenses, the receipt of reasonable benefits, the receipt of nominal fees, or a combination thereof. 29 C.F.R. §§ 553.104(a) and 553.106(a) (2000). Specifically, § 553.106(d) provides:

> Individuals do not lose their volunteer status if they are provided reasonable benefits by a public agency for whom they perform volunteer services. Benefits would be considered reasonable, for example, when they involve inclusion of individual volunteers in group insurance plans (such as liability, health, life, disability, workers' compensation) or pension plans or "length of service" awards, commonly or traditionally provided to volunteers of State and local government agencies . . . .

Regarding the payment of a nominal fee, § 553.106(e) provides in part:

> Individuals do not lose their volunteer status if they receive a nominal fee from a public agency. A nominal fee is not a substitute for compensation and must not be tied to productivity. However, this does not preclude the payment of a nominal amount on a "per call" or similar basis to volunteer firefighters.

The general test in determining whether an individual is entitled to volunteer status is contained in § 553.106(f):

> Whether the furnishing of expenses, benefits, or fees would result in individuals' losing their status as volunteers under the [Fair Labor Standards Act] can only be determined by examining the total amount of payments made (expenses, benefits, fees) in the context of the economic realities of the particular situation.

In *State ex rel. Retchless v. Cook*, 181 Neb. 863, 869, 152 N.W.2d 23, 27 (1967), we concluded that a volunteer firefighter who received $1 per hour for each drill, $1 for the first hour of each call, 50 cents for each subsequent hour on a call, and $25 per week for night duty was not a "fireman of a 'paid fire department'" who would qualify for pension benefits. Although our resolution of that case was based upon a distinction between a city's volunteer firefighters and those who received salaries, our reasoning that the nominal compensation paid did not affect volunteer status is equally applicable to the instant case. The mere fact that members of BVFD have the opportunity to receive a nominal pension amount after serving 20 years with BVFD and attaining age 60 does not affect their status as "volunteers" under § 13-903(3) based on the plain meaning of that term.

Hatcher's argument to the contrary is premised upon *Southeast Rur. Vol. Fire Dept. v. Neb. Dept. of Rev.*, 251 Neb. 852, 560 N.W.2d 436 (1997), and *Chase v. Baltimore*, 126 Md. App. 427, 730 A.2d 239 (1999). These cases, however, are distinguishable from the instant case. In addition, we note that *Chase* was reversed on other grounds by *Baltimore v. Chase*, 360 Md. 121, 756 A.2d 987 (2000).

In *Southeast Rur. Vol. Fire Dept.*, the volunteer fire department raised money pursuant to charitable gambling licenses. The

money was used to institute a retirement plan in order to encourage firefighters to remain with the department. The issue presented was whether the department's expenditure of gaming funds to the retirement plan was a proper "lawful purpose" under Neb. Rev. Stat. §§ 9-211 and 9-309 (Reissue 1997). Such statutes generally allowed donations to charitable organizations, provided no donations "inure[d] to the benefit of any individual member" of the organization making the donation. §§ 9-211(3)(a) and 9-309(3)(a). Reasoning that any intended benefit to the general public from the retirement plan was merely incidental, we determined that the donations were improper under §§ 9-211 and 9-309 because they "inure[d] to the benefit of Southeast Volunteer's individual members." *Id.* at 862, 560 N.W.2d at 443.

Hatcher argues that this holding establishes that the length of service benefits at issue in the instant case "inured" to the benefit of BVFD members, thus precluding them from having the status of true volunteers. While it is true that the benefits do indeed inure to the benefit of those members qualifying for the pension plan, our holding in *Southeast Rur. Vol. Fire Dept.* in no manner dictates that such inurement affects a firefighter's volunteer status.

Hatcher's reliance upon *Chase v. Baltimore, supra,* is similarly misplaced. That case involved the application of a "Good Samaritan Act" which granted immunity for acts or omissions in giving medical care if the assistance was provided " 'without fee or other compensation.' " *Id.* at 437, 730 A.2d at 244. Although the paramedic at issue was a salaried employee of the city of Baltimore, application of that act as analyzed by the court presented the question of whether a $100 charge billed to the patient was a "fee or other compensation," thus removing the employee from the protection of the Good Samaritan Act. Finding that such charge constituted a fee or compensation, the court ruled that the Good Samaritan Act did not apply.

Although Hatcher alleges that the $100 fee charged by BVFD is similar to the $100 fee charged in *Chase v. Baltimore, supra,* we do not find *Chase* controlling or persuasive. The issue there was whether the patient was required to pay a "fee or other compensation," not whether the charge affected the paramedic's volunteer status. Based upon our holding in *State ex. rel. Retchless v. Cook,* 181 Neb. 863, 152 N.W.2d 23 (1967), and the federal regulations

cited above, we conclude that the nominal benefit provided to members of BVFD in the form of the length of service plan does not affect the volunteer status of the firefighter members.

### (ii) Contractor Status

Next, Hatcher argues that BVFD and its members are contractors of a political subdivision and therefore not volunteer firefighters under the Political Subdivisions Tort Claims Act. Section 13-903(1) and (3) provide that a political subdivision or an employee of a political subdivision "shall not be construed to include any contractor with a political subdivision." The act does not define contractor. As noted earlier, in the absence of anything to the contrary, statutory language is to be given its plain and ordinary meaning; an appellate court will not resort to interpretation to ascertain the meaning of statutory words which are plain, direct, and unambiguous. *Jones v. Paulson*, 261 Neb. 327, 622 N.W.2d 857 (2001).

It is undisputed that neither BVFD nor any of its members had a written contract with the city of Bellevue or any other political subdivision. Nevertheless, Hatcher contends that a contract was implied in fact between BVFD and the city of Bellevue. Citing Black's Law Dictionary, Hatcher contends that the plain meaning of "contractor" is " 'one who in pursuit of independent business undertakes to perform a job or piece of work, retaining in himself control of the means, method and manner of accomplishing the desired result.' " Brief for appellant at 26. She asserts that BVFD falls within this definition because it is an independent corporation that controls its own budget, acquisition of equipment, investments, discipline, and membership. She generally alleges that BVFD is an implied-in-fact contractor with the city of Bellevue or another political subdivision because the work it provides is fire protection services for the city.

This argument lacks merit. The fact that BVFD controls its operations and provides services to the city does not lead to the conclusion that it is a "contractor" with the city of Bellevue. Even the authority relied upon by Hatcher reveals that the plain meaning of "contractor" is one who enters into an agreement to provide goods or services *for a fixed price* and who does so in a manner that involves control of its own operations. (Emphasis

supplied.) See Black's Law Dictionary 326 (6th ed. 1990). Although the city of Bellevue provides certain financial benefits to BVFD, BVFD is a separate entity with a membership of volunteer firefighters. Such members provide fire protection services in a purely voluntary manner not based upon a fee schedule or compensation agreement with the city. Neither BVFD nor its members are within the plain meaning of a "contractor" of the city of Bellevue or any other political subdivision.

### (iii) Volunteer Firefighter Capacity

Hatcher's final argument is that the individuals for whose actions she alleges BVFD to be vicariously liable were acting within the scope of their employment as officers of BVFD at the time of the April 15, 1998, meeting and were not acting as volunteer firefighters. Although Hatcher relies upon Neb. Rev. Stat. § 48-115(1) (Supp. 1997) to support her argument, this statute is part of the Nebraska Workers' Compensation Act and has no application to the present facts.

Hatcher generally contends that immunity for volunteer firefighters under § 13-903(3) extends to only actual rescue and firefighting activities. However, the plain language of the statute contains no such limitation. The record clearly demonstrates that Betts, Tedder, and Almsteier attended the meeting at Midlands Hospital in their capacities as officers of BVFD and that the meeting generally related to the business relationship between BVFD and its members and Midlands Hospital. BVFD members were clearly acting within the scope of their duties as officers of the volunteer fire department and, as such, were acting as "volunteer firefighters."

### (b) Are Individuals Immune?

■ Hatcher also argues that the three individual BVFD members, even if they are "volunteer firefighters," cannot be entitled to immunity under the Political Subdivisions Tort Claims Act because they are employees of a nonprofit corporation, not employees of a political subdivision. Section 13-903(3) defines an "Employee of a political subdivision" to include "volunteer firefighters." In the absence of anything to the contrary, statutory language is to be given its plain and ordinary meaning; an

appellate court will not resort to interpretation to ascertain the meaning of statutory words which are plain, direct, and unambiguous. *Jones v. Paulson,* 261 Neb. 327, 622 N.W.2d 857 (2001). A court must attempt to give effect to all parts of a statute, and if it can be avoided, no word, clause, or sentence will be rejected as superfluous or meaningless; it is not within the province of a court to read anything plain, direct, and unambiguous out of a statute. *In re Estate of Tvrz,* 260 Neb. 991, 620 N.W.2d 757 (2001). The plain language of § 13-903(3) defines a volunteer firefighter as an employee of a political subdivision. Therefore, the individual members, as volunteer firefighters, are employees of a political subdivision for purposes of the act, and any claim against them individually is governed by the act. Section 13-910(7) specifically provides that the liability imposed by the act shall not apply to "[a]ny claim arising out of assault, battery, false arrest, false imprisonment, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or *interference with contract rights.*" (Emphasis supplied.) It is clear from the record that Hatcher's claim falls within this exception to the general waiver of tort liability provided for in § 13-902. Thus, § 13-910(7) affords to the three individuals a complete defense to Hatcher's claim of intentional interference with her contractual relationship with NEC.

### (c) Does Immunity of Volunteer Firefighters Extend to BVFD?

In *Wicker v. City of Ord,* 233 Neb. 705, 711, 447 N.W.2d 628, 633 (1989), we recognized the general rule that "when a public employee has been found to be immune from liability . . . such immunity extends to the political subdivision." See, *Allen v. County of Lancaster,* 218 Neb. 163, 352 N.W.2d 883 (1984) (holding county health officer's discretionary immunity also immunized county from liability); *Koepf v. County of York,* 198 Neb. 67, 251 N.W.2d 866 (1977) (holding sheriff's quasi-judicial immunity for ministerial acts also immunized county from liability). Applying this general rule in *Wicker,* we held that the statutory immunity conferred upon certified ambulance attendants who responded to an emergency call shielded a volunteer fire department, as their principal, to the same extent it shielded the

individuals. More recently, in *Drake v. Drake*, 260 Neb. 530, 544, 618 N.W.2d 650, 661 (2000), we held that the immunity which Neb. Rev. Stat. § 71-5194 (Cum. Supp. 2000) confers upon ambulance attendants "also immunizes the city or other entity with whom those individuals might be in an agency relationship."

■ The fact that BVFD is not itself a political subdivision does not alter the basic agency principles upon which its potential liability for the alleged actions of its members must be analyzed. Under the doctrine of respondeat superior, the principal's liability is derived solely from that of its agent. *Kocsis v. Harrison*, 249 Neb. 274, 543 N.W.2d 164 (1996); *Plock v. Crossroads Joint Venture*, 239 Neb. 211, 475 N.W.2d 105 (1991), *overruled on other grounds, Hynes v. Hogan*, 251 Neb. 404, 558 N.W.2d 35 (1997). Unless the agent is liable, there can be no liability on the part of the principal. *Kocsis v. Harrison, supra.* Applying this rule in the instant case, we conclude that the vicarious liability claim against BVFD is barred as a matter of law because of the immunity of Betts, Tedder, and Almsteier under the act.

### 2. Conspiracy

As noted above, the district court did not directly address Hatcher's separate claim that BVFD "conspired with its Fire Chief, Assistant Fire Chief and Rescue Chief, and others, to damage [Hatcher] by persuading NEC to terminate [her] employment." Hatcher argues that this omission requires a remand for further proceedings.

Hatcher's argument in this regard is based upon an assertion that Nebraska recognizes a separate tort of "conspiracy" that is not in combination with any underlying crime or illegal or wrongful act. She further argues that the Political Subdivisions Tort Claims Act does not bar the tort of "conspiracy" from being asserted against a political subdivision or its employees. See § 13-910. An essential premise of this argument is Hatcher's contention that her claim of conspiracy to interfere with her business relationship is not a claim arising out of interference with contract rights under § 13-910(7).

■ In *Koster v. P & P Enters.*, 248 Neb. 759, 764, 539 N.W.2d 274, 278 (1995), we stated, "In proving conspiracy to tortiously interfere with a business relationship, a claim of civil

conspiracy is not actionable in itself, but serves to impose vicarious liability for the underlying tort of those who are a party to the conspiracy." We then set forth the elements of tortious interference with a business relationship and examined whether the plaintiff had established those elements in deciding whether there was evidence of conspiracy to tortiously interfere with a business relationship. Similarly, in *Upah v. Ancona Bros. Co.*, 246 Neb. 585, 521 N.W.2d 895 (1994), *disapproved on other grounds, Welsch v. Graves*, 255 Neb. 62, 582 N.W.2d 312 (1998), we concluded that the statute of limitations applicable to a claim of civil conspiracy is that applicable to the underlying wrong. These cases clearly establish that a "conspiracy" is not a separate and independent tort in itself, but, rather, is dependent upon the existence of an underlying tort. Without such underlying tort, there can be no cause of action for a conspiracy to commit the tort.

Hatcher cites this court to *Dixon v. Reconciliation, Inc.*, 206 Neb. 45, 291 N.W.2d 230 (1980), and *Frank H. Gibson, Inc. v. Omaha Coffee Co.*, 179 Neb. 169, 137 N.W.2d 701 (1965), for the proposition that "conspiracy" is a separate tort in the State of Nebraska. She does not present us with an argument as to how those cases support such a proposition, and we are unable to find such support in either case. *Dixon*, in fact, recognizes that the general rule in Nebraska is that civil conspiracy is not a separate tort and quotes William L. Prosser, Handbook of the Law of Torts § 47 (4th ed. 1971):

> "There has been a good deal of discussion as to whether conspiracy is to be regarded as a separate tort in itself. On the one hand, it is clear that the mere agreement to do a wrongful act can never alone amount to a tort, whether or not it may be a crime; *and that some act must be committed by one of the parties in pursuance of the agreement, which is itself a tort.* 'The gist of the action is not the conspiracy charged, but the tort working damage to the plaintiff.' "

(Emphasis supplied.) *Dixon*, 206 Neb. at 48, 291 N.W.2d at 232. We further stated in *Dixon* that "[t]o state a cause of action for conspiracy, it is necessary for the pleader to allege not only *the conspiracy and the doing of the wrongful acts*, but also facts showing that damage resulted therefrom." (Emphasis supplied.) 206 Neb. at 49, 291 N.W.2d at 233.

Our case law thus clearly reveals that one can be vicariously liable for one's role in a civil conspiracy only if there is liability for an underlying tort. The underlying tort alleged in the instant case is tortious interference with Hatcher's business relationship. Because BVFD members, and therefore BVFD itself, are immune from such a claim, BVFD is similarly immune from a civil conspiracy claim arising out of an alleged interference with Hatcher's contract rights.

## V. CONCLUSION

For the foregoing reasons, we conclude that the individual members of BVFD are "volunteer firefighters" and therefore "[e]mployees of a political subdivision" pursuant to § 13-903(3). Such persons are immune under § 13-910(7) from a suit based upon claims arising out of the interference of contractual rights. Because Hatcher's claims against BVFD are based solely upon the actions of its individual members who themselves are immune from suit, such immunity extends to BVFD under recognized agency principles. This immunity on the underlying tort bars Hatcher's conspiracy claim as well. Because this holding is dispositive, we need not address Hatcher's other assignments of error. The judgment of the district court is affirmed.

AFFIRMED.