779 N.W.2d 343 (2010)
279 Neb. 509
Matthew L. ASHBY, individually, and M.A., a minor, by and through Matthew L. Ashby, his father and next friend, appellants,
v.
STATE of Nebraska et al., appellees.
No. S-08-1274.
Supreme Court of Nebraska.
March 5, 2010.
*348 Herbert J. Friedman and Daniel H. Friedman, of Friedman Law Offices, Lincoln, for appellants.
Jon Bruning, Attorney General, and Michael J. Rumbaugh, Lincoln, for appellees State of Nebraska and Mary Dyer.
Susan Kubert Sapp and Stanton N. Beeder, of Cline, Williams, Wright, Johnson & Oldfather, L.L.P., Lincoln, for appellees Monica Taylor Kilmer, Douglas Eric Black, and Tammy Norris Black.
Milton A. Katskee and Melvin R. Katskee, of Katskee, Henatsch & Suing, Omaha, for appellees Estate of Michael Washburn and Erickson & Sederstrom, P.C.
Walter E. Zink II and Amanda A. Dutton, of Baylor, Evnen, Curtiss, Grimit & Witt, L.L.P., Lincoln, for appellee Bryant A. Whitmire.
HEAVICAN, C.J., CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
CONNOLLY, J.

SUMMARY
Matthew L. Ashby is the biological father of M.A., born in January 2004. Ashby never married M.A.'s mother, Monica Taylor Kilmer, and she never listed Ashby as M.A.'s father on the birth certificate. But Ashby registered with the biological father registry within the statutory period to claim paternity.[1] Before the period expired, however, the State of Nebraska, acting through adoption specialist Mary Dyer, allowed the prospective adoptive parents, Douglas Eric Black and Tammy Norris Black, to take M.A. to Alabama. Ashby claims that the State and Dyer acted negligently and violated his due process rights in allowing M.A. to leave the state while Ashby could still assert paternity. The State disagrees. It contends that Dyer had met all the requirements under Nebraska law and the Interstate Compact on the Placement of Children (ICPC).[2]
Ashby also brings claims against Kilmer; the Blacks; the Blacks' attorney in Alabama, Bryant A. Whitmire; the estate of Kilmer's attorney in Nebraska, Michael Washburn; and Washburn's former law firm, Erickson & Sederstrom, P.C. He claims that all parties knew that he would contest the adoption and that they attempted to complete the adoption without informing him. Ashby sued the defendants for civil conspiracy, false imprisonment, constructive fraud, misrepresentation, and breach of fiduciary duty. Ashby also sued Kilmer's parents and the agency that facilitated the adoption, but those claims were dismissed and are not appealed.
The defendants moved for summary judgment, which the district court granted. Ashby, individually and on behalf of M.A., appeals, and we affirm.

FACTS

M.A.'S BIRTH AND ADOPTION
Ashby and Kilmer separated shortly after M.A.'s conception. Before their separation, Kilmer informed Ashby that she was pregnant and was considering adoption. Ashby told her that if she did not want to raise the child, he would, and that he would not relinquish his parental rights or consent to an adoption. Before M.A.'s *349 birth, however, he did not register with the biological father registry to receive notice of any intended adoption, nor did he give notice that he objected to an adoption and intended to claim paternity.[3] The two did not see each other or speak again until after the child was born.
Kilmer contacted a private adoption agency and, through the agency, selected the Blacks, a married couple living in Alabama, to adopt her child. The day after M.A.'s birth, the Blacks came to Nebraska, and about 2 weeks later, they returned to Alabama with M.A. They commenced adoption proceedings in that state.
Washburn represented Kilmer in the private adoption. Because the Blacks lived out of state, Dyer helped in the adoption. Dyer is an adoption specialist with the Department of Health and Human Services and the person charged with assisting out-of-state adoptions under Nebraska's ICPC. According to Dyer, she approves the removal of children from Nebraska for adoption placement in other states. She approves each placement by filling out a form and then forwarding the paperwork approving the placement to her counterpart in the state receiving the child. Dyer stated that she could prevent a child from being placed in another state.
Dyer stated that because this was a private adoption, the State has no responsibility to determine whether a putative father has filed a notice of intent to claim custody. According to her, when a State ward is adopted, the State would prepare the adoption paperwork and would check the biological father registry. But because this was a private adoption, Dyer never checked to confirm whether Ashby had registered with the biological father registry or had received notification of the proposed adoption. She noted that even if she had checked, at the time she approved the placement, Ashby had still not registered.
Dyer testified that the biological mother's attorney carries the burden to check the registry in private adoptions. Dyer acknowledged that the publication notice she received from Washburn put her on notice that Ashby had until February 12, 2004, to register for paternity. But she claims that because the paperwork also indicated that Washburn had mailed a registered letter to Ashby on January 8, 2004, Ashby perhaps had only 5 business days after January 8 to register. Although she acknowledged that her file lacked a receipt from the letter and that she had no proof that Ashby had actually received the letter, she stated that she had no reason to doubt that Washburn had actually contacted Ashby by mail. Dyer also acknowledged that Washburn had indicated that Ashby was unwilling to agree to the adoption and would not sign the consent to the adoption. She admitted that she normally required a "no claim of paternity" certificate before allowing children to leave the state when a biological father has not signed the documents allowing the adoption. But she had not received, nor did she require, such certificate from Washburn.
Because Dyer knew that Ashby still had time to assert his paternity, she had the Blacks sign an at-risk placement notice that required them to return the child to Nebraska if Ashby asserted his paternity.[4] Dyer testified that although she approves the placement of children outside the state, her duties required only that she execute an at-risk placement form. She contended her duties did not require her to determine whether the biological father has registered *350 with the Department of Health and Human Services' vital records section. Yet, she acknowledged that she has the ultimate power to determine whether a child born in Nebraska may leave the state for a preadoption placement.

ASHBY'S PATERNITY AND CUSTODY ORDER
Before M.A.'s birth, Washburn attempted to contact Ashby by mail about the pending adoption. Washburn allegedly sent a letter to Ashby on January 8, 2004, but the record indicates that he never received a return receipt confirming that Ashby received the letter. Ashby claims that Washburn sent the letter to the wrong address and that he did not receive it until January 29, 8 days after M.A.'s birth. But Washburn also published notice of the birth, and under the statutes in effect at the time, Ashby had until February 12 to register. On January 30, the day after he received Washburn's letter, Ashby registered and filed for custody.
On April 21, 2004, the Madison County Court held a custody hearing. The court's order stated that Ashby had timely filed his notice of intent to claim paternity and that he was the biological father of the child, and it granted him custody. At that time, Dyer contacted the Alabama ICPC office and informed it that under the at-risk placement agreement, the Blacks had to return M.A. to Nebraska. The Blacks refused.
Ashby, armed with the custody order, went to Alabama to have it enforced. The Alabama court, however, eventually declined to enforce the custody order because Ashby had failed to include the Blacks as parties to the action as required by the Uniform Child Custody Jurisdiction and Enforcement Act[5] and Parental Kidnapping Prevention Act of 1980.[6] The Alabama court concluded that the Nebraska judgment was valid as to Ashby's paternity but not valid as to the custody determination. So it did not order the Blacks to return M.A. to Nebraska.[7] It concluded, however, that M.A.'s custody should be determined in Nebraska after Ashby included the Blacks as parties in the custody case. It also stayed the adoption proceedings in Alabama until that happened. The record fails to show that Ashby took any further action to obtain custody. And in February 2009, Ashby voluntarily relinquished his parental rights in a settlement with the Blacks. The settlement, however, reserved his claims in this suit filed in the Lancaster County District Court.

ASHBY'S STATE COURT CLAIMS AND DISTRICT COURT'S DISPOSITION
In the Lancaster County District Court action, Ashby alleged that the State, through its employee Dyer, negligently allowed M.A. to leave Nebraska before determining whether Ashby was properly notified of the adoption. And he alleges that Dyer's actions deprived him of procedural and substantive due process rights under 42 U.S.C. § 1983 (2006). Ashby also claimed that (1) all the defendants conspired to violate his civil rights and deprive him of a parental relationship with his son; (2) the Blacks falsely imprisoned M.A.; and (3) Dyer, Kilmer, the Blacks, Whitmire, Washburn, and Erickson & Sederstrom engaged in constructive fraud, misrepresentation, and breach of fiduciary duty. He sought not the return of his son, but compensatory and punitive damages.
*351 In two separate orders, the district court granted summary judgment to Kilmer, the Blacks, Whitmire, Washburn, and Erickson & Sederstrom. In April 2008, the court denied Ashby's request that the court order Whitmire to produce his file on M.A. And in November 2008, the court granted summary judgment to the State and Dyer. Ashby now appeals.
Regarding the negligence claim against the State, the court concluded that (1) Dyer had no duty to check the biological father registry before allowing M.A. to leave Nebraska and (2) the State's only duty was to ensure that it met the ICPC requirements, which Dyer had done. Because the State had no duty, it could not be negligent. The court also found that res judicata barred Ashby's § 1983 claim against Dyer in her official capacity because a federal district court had decided the claim against Ashby.[8] And, because the evidence indicated that Dyer did not act in any capacity other than her official capacity, the court dismissed Ashby's § 1983 claim against her in her individual capacity.
Regarding the civil conspiracy claim, the court found that the evidence failed to show any agreement between the defendants to deprive Ashby of the opportunity to assert his parental rights. To the contrary, the court found that Ashby had established his paternity in both Nebraska and Alabama courts before the Blacks finalized the adoption. The court also found Ashby's false imprisonment claim failed because the Blacks had an order from an Alabama court granting them custody. The court found all other claims meritless and dismissed the case.

ASHBY'S FEDERAL COURT CLAIMS AND FEDERAL DISTRICT COURT'S DISPOSITION
In the federal case, Ashby filed a § 1983 lawsuit against Dyer, Kilmer, the Blacks, Whitmire, Washburn, Erickson & Sederstrom, and other defendants. He claimed that all the defendants, acting under the color of state law, conspired to deprive him of due process by removing M.A. to another state for adoption. He also made state law claims of civil conspiracy, negligence, fraud, misrepresentation, and breach of fiduciary duty against all the defendants and a false imprisonment claim against the Blacks.
In April 2006, the federal court dismissed, with prejudice, the § 1983 claim against Dyer in her official capacity because Ashby was only requesting monetary damages. Regarding the claim against Dyer in her individual capacity, the court concluded that Ashby's allegation failed to state a § 1983 claim based on a civil conspiracy. The court concluded that a plaintiff's allegations that a state official acted negligently are insufficient to state a constitutional claim.[9] And, assuming that Dyer knew of Ashby's paternity claim, Ashby failed to allege that she shared this information. So there was not a "`meeting of the minds'" between Dyer and the other defendants "to violate [Ashby's] constitutional rights."[10] Because Dyer's allegations failed to show a state action, the federal court concluded that it lacked jurisdiction and dismissed the claims. It dismissed with prejudice the § 1983 claims against Dyer, in her official capacity, and against the remaining defendants. It apparently dismissed without prejudice the § 1983 claim against Dyer, in her individual *352 capacity, and Ashby's remaining state law claims.

ASSIGNMENTS OF ERROR
Ashby alleges that the district court erred in (1) granting summary judgment to the State on his negligence claim; (2) finding that res judicata barred his § 1983 claim against Dyer, in her individual capacity; (3) granting summary judgment to Kilmer, the Blacks, Whitmire, Washburn, and Erickson & Sederstrom on his civil conspiracy claim; and (4) denying his motion to compel Whitmire to answer discovery questions.

STANDARD OF REVIEW
We determine questions of law independently of the determination reached by the lower court.[11]
Summary judgment is proper if the pleadings and admissible evidence offered at the hearing show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law.[12] In reviewing a summary judgment, we view the evidence in the light most favorable to the party against whom the judgment was granted, and we give that party the benefit of all reasonable inferences deducible from the evidence.[13]

ANALYSIS

NEGLIGENCE CLAIM AGAINST THE STATE
Ashby alleges that the district court erred in finding that the State owed no duty to Ashby. To recover in a negligence action brought under the State Tort Claims Act,[14] a plaintiff must show a legal duty owed by the defendant to the plaintiff, a breach of such duty, causation, and damages.[15] The threshold issue in any negligence action is whether the defendant owes a legal duty to the plaintiff.[16] The law defines a duty as "an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another."[17] The question whether a legal duty exists for actionable negligence is a question of law dependent on the facts in a particular situation.[18]
The alleged duty Ashby places on the State does not come from a single source. Instead, we understand Ashby's argument to be that based upon a combination of constitutional and statutory law, the State had a duty to confirm whether he had consented to the adoption, or that the Blacks did not need his consent, before the State approved M.A.'s removal from Nebraska. Ashby contends that the State is a "`sending agency'" under the ICPC in effect at the time of M.A.'s removal.[19] *353 (The ICPC was amended in 2009.)[20] Ashby alleges that as a sending agency, the State must comply with every requirement in the ICPC and with Nebraska's adoption statutes. Ashby also asserts that as a sending agency under the ICPC, the State "`retain[s] jurisdiction over the child sufficient to determine all matters in relation to the custody, supervision, care, treatment and disposition of the child which it would have had if the child had remained in the sending agency's state....'"[21]
Ashby argues that these statutes require the State to satisfy the consent laws for in-state adoptions before permitting a child to be placed with out-of-state adoptive parents. He also argues that the State must comply with Nebraska adoption law to protect his constitutional parental right to care for and have custody of his child.[22] Ashby, however, does not challenge the constitutionality of any statute.
We agree with Ashby that in a private adoption, Nebraska is a sending agency under the ICPC. The ICPC defines a sending agency as "a party state, officer or employee thereof; a subdivision of a party state, or officer or employee thereof; a court of a party state; a person, corporation, association, charitable agency or other entity which sends, brings, or causes to be sent or brought any child to another party state."[23]
The State argues that in a private adoption, the sending agency under the ICPC is the birth mother, not the State. We agree that the birth mother is a sending agency.[24] But we also believe that in a given placement, more than one individual or entity could be a sending agency. Here, Kilmer was a sending agency because she initiated and consented to placing M.A. with the Blacks. But the State, through Dyer, was also a sending agency. Dyer facilitated and approved the removal of M.A. from Nebraska, causing M.A.'s placement in Alabama. According to her own testimony, Dyer had the power to refuse to authorize removal of M.A. from Nebraska. So we do not agree with the State's argument that Kilmer was the sole person responsible for allowing the removal of M.A. The definition of a sending agency appears broad enough to include any individual or entity that causes a child to be moved interstate, even if that means there are multiple sending agencies in a single adoption. We conclude that the State is a sending agency under the ICPC.
But even if the State is a sending agency, for it to be negligent, it must have breached a duty owed to Ashby. Ashby asserts that the statutes require the State to determine whether he had consented to the adoption or whether his consent was not required before allowing M.A. to leave Nebraska. To address this argument, we look to Nebraska's paternity statutes.
When a child is born out of wedlock and the biological mother desires to relinquish her rights to the child, the biological mother's attorney or the adoption agency facilitating the adoption must attempt to notify the biological father or possible biological *354 fathers. As outlined in Neb.Rev.Stat. § 43-104.08 (Reissue 2004):
Whenever a child is claimed to be born out of wedlock and the biological mother contacts an adoption agency or attorney to relinquish her rights to the child ... the agency or attorney contacted shall attempt to establish the identity of the biological father and further attempt to inform the biological father of his right to execute a relinquishment and consent to adoption, or a denial of paternity and waiver of rights....
The notice must be served in advance of the child's birth, whenever possible, to allow the biological father to comply with the registration requirements. And the notice must inform the putative father that he may have the right to file a notice of objection and intent to obtain custody.[25]
The biological father can be notified by registered or certified mail, restricted delivery, return receipt requested.[26] Or, "[i]f the agency or attorney representing the biological mother is unable through reasonable efforts to locate and serve notice on the biological father or possible biological fathers as contemplated in sections 43-104.12 and 43-104.13, the agency or attorney shall notify the biological father or possible biological fathers by publication."[27] So, in a private adoption, regardless of how the attorney or adoption agency attempts to notify a biological father, the attorney or agency must exercise diligence to "identify and give actual or constructive notice to the biological father."[28]
But Nebraska's statutes do not prohibit placement with adoptive parents before notice is perfected. Instead, "[i]f the biological father [is] not given actual or constructive notice prior to the time of placement," the prospective adoptive parents are required to sign an at-risk placement form.[29] The form "give[s] the adoptive parents a statement of legal risk indicating the legal status of the biological father's parental rights as of the time of placement."[30] In signing the form, the adoptive parents "are acknowledging their acceptance of the placement, notwithstanding the legal risk."[31]
Here, Washburn attempted to, and eventually did, notify Ashby of the proposed adoption. But the notification took place after M.A.'s birth. As required by statute, Dyer approved placement of M.A. with the Blacks only after they signed an at-risk placement form. The form explicitly stated that "in the event the birth father comes forward, or asse[r]ts his interest in the subject child, even after the time of placement, the State of Alabama may require the undersigned to return the child to the State of Nebraska for further determination on the rights of the putative father." Nebraska's statutes require the birth mother's attorney or adoption agency, not the State, to notify the biological father of a proposed adoption. More important, these statutes specifically permit the State to approve out-of-state placement with prospective adoptive parents without the biological father's consent or notification if the prospective adoptive parents have signed an at-risk placement form.
*355 Contrary to Ashby's claims, the State had no obligation under any of the paternity statutes or the ICPC to confirm that Ashby consented to the adoption before allowing M.A. to leave the state. We agree that the State, as a sending agency, was required to ensure ICPC compliance before allowing M.A. to leave Nebraska.[32] But nothing in the ICPC requires the State to ensure that a possible biological father has consented to an adoption or has not claimed paternity before approving a child's placement in a prospective adoptive home.
Ashby contends that an at-risk placement form provides an inadequate substitute for Ashby's notice of, or consent to, the adoption. To reach that conclusion, Ashby would have us read into § 43-104.15 a different requirement for out-of-state at-risk placements than for in-state at-risk placements. But in the absence of ambiguity or constitutional defect, courts must give effect to statutes as they are written.[33] And Ashby has not challenged the constitutionality of § 43-104.15 or claimed that it is ambiguous. Section 43-104.15 permitted the at-risk placement with the Blacks, and we find nothing in either the ICPC or Nebraska law that placed a duty on the State to confirm that Ashby had first consented to the adoption.
Ashby also argues, however, that when reading Nebraska's adoption laws in pari materia with the paternity statutes, the statutes require consent for the adoption before making an out-of-state placement. He points to Neb.Rev.Stat. § 43-104(1) (Reissue 2004), which states "no adoption shall be decreed unless written consents" are executed by "both the mother and father of a child born out of wedlock." Here, however, the issue focuses on the placement of a child in another state. Ashby's argument confuses "adoption" with "placement." Placements occur before an adoption, and Nebraska's statutes permit both in-state and out-of-state placements without prior consent.
In assisting this out-of-state private adoption, the State fulfilled its obligations. Despite Ashby's arguments to the contrary, the State did not have a duty to confirm that Ashby consented to the adoption before allowing the Blacks to remove M.A. from Nebraska. Absent a duty, a negligence claim fails.[34] The district court did not err in granting summary judgment to the State.

§ 1983 CLAIM AGAINST DYER
In addition to his state court lawsuit, Ashby filed a nearly identical lawsuit against Dyer and the other defendants in federal court. In the federal lawsuit, Ashby alleged that Dyer, acting under the color of state law, conspired with the other defendants to deprive Ashby of due process by removing his son from Nebraska to Alabama for adoption.
The federal court dismissed the lawsuit in April 2006. In evaluating Ashby's § 1983 claim, the federal court held that because Ashby sought only monetary damages from Dyer, his lawsuit against her in her official capacity was barred by the 11th Amendment.[35] The federal court also recognized that Dyer had failed to affirmatively allege a qualified immunity defense *356 and addressed the claims against her in her individual capacity on the merits.
The federal court then identified what a plaintiff must show for a § 1983 claim based on civil conspiracy, and it concluded Ashby's allegations failed to state a claim. Ashby claimed only that Dyer had allowed M.A. to leave the state without confirming whether Ashby's paternity had been determined. And he claimed that Dyer did not rescind her permission for M.A. to leave the state once Ashby filed his notice of intent to claim paternity. The federal court held that Ashby's allegations regarding Dyer's actions amounted only to negligence, which cannot form the basis of a constitutional tort claim.[36] Furthermore, the federal court found that even if Dyer knew that Ashby was claiming paternity, Ashby did not allege that she shared this information with the other defendants.
In this appeal, Ashby brought a § 1983 claim against Dyer in her official and individual capacities.[37] We agree with the federal district court that sovereign immunity bars Ashby's § 1983 claim against Dyer, in her official capacity, because he sought only money damages. We conclude that the Lancaster County District Court properly dismissed the § 1983 claim against Dyer, in her official capacity, based upon res judicata.
Regarding Ashby's claim against Dyer in her individual capacity, he contends, restated, that Dyer violated his constitutionally protected due process rights. He argues that Dyer allowed M.A. to leave the state without confirming whether Ashby had consented to the adoption. In a suit under § 1983, the first inquiry is whether the plaintiff has been deprived of a right secured by the Constitution and laws within the meaning of § 1983.[38] As the federal court did, we will assume that Ashby has articulated a parental right that the federal court would protect. Section 1983, however, imposes liability for violations of rights protected by the federal Constitution, not for violations of duties of care arising out of tort law.[39] Here, as in the federal case, Ashby's allegations against Dyer show, at most, only negligent conduct. And the record fails to show a deliberate indifference to Ashby's constitutional rights. In both cases, he claimed that Dyer failed to determine whether he consented to the adoption before approving M.A.'s placement with the Blacks. We, like the federal district court, conclude that allegations of negligence are insufficient to state a constitutional tort claim and that the district court properly dismissed Ashby's § 1983 claim against Dyer in her individual capacity.[40]
We note, however, that the Lancaster County District Court dismissed the § 1983 claim against Dyer, in her individual capacity, because Ashby failed to show that she had acted in her individual capacity. The court's holding, however, confuses a state's sovereign immunity with a state official's qualified immunity. When a plaintiff sues a state official, a court must first analyze whether the plaintiff has sued the official in his or her official or individual capacity for purposes of state sovereign *357 immunity.[41] If the court determines that a state official has been sued in his or her individual capacity, the court can address the official's qualified immunity from civil damages. That inquiry focuses not on whether the official has acted in his or her individual capacity, but on whether the official's conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known.[42] Here, Ashby sued Dyer in her individual capacity, so whether she acted in her individual capacity is irrelevant. Thus, the court's reasoning was incorrect; but again, we will not reverse a proper result merely because the court's decision rested on the wrong reason.[43]

CIVIL CONSPIRACY CLAIM AGAINST KILMER, THE BLACKS, WHITMIRE, WASHBURN, AND ERICKSON & SEDERSTROM
Ashby asserts that Kilmer, the Blacks, Whitmire, Washburn, and Erickson & Sederstrom engaged in a conspiracy to intentionally interfere and deprive Ashby of his right to have custody of M.A. and to establish a parental relationship with him. We do not include Whitmire in our discussion because, as addressed below, the district court lacked personal jurisdiction over him.
A civil conspiracy is a combination of two or more persons acting in concert to accomplish an unlawful or oppressive object, or a lawful object by unlawful or oppressive means.[44] A party does not have to prove a civil conspiracy by direct evidence of the acts charged. It may be proved by a number of indefinite acts, conditions, and circumstances which vary according to the purpose to be accomplished.[45] It is, however, necessary to prove the existence of at least an implied agreement to establish conspiracy.[46] Furthermore, a civil conspiracy is only actionable if the alleged conspirators actually committed some underlying misconduct.[47] And a conspiracy is not a separate and independent tort in itself; rather, it depends upon the existence of an underlying tort.[48] So without such underlying tort, there can be no cause of action for a conspiracy to commit the tort.[49]
Applying these principles, we turn to Ashby's allegations regarding the underlying tortintentional interference with his parental rights. Ashby contends that Nebraska recognizes a cause of action for the intentional interference with a parent's right to custody. Specifically, that "the defendants could be held liable for entering into a conspiracy with the goal of interfering with Ashby's right to establish a relationship with, and custody of, his *358 child."[50]
We have held that parents may assert a cause of action against a third party who wrongfully deprives them of their parental rights.[51] In Tavlinsky v. Ringling Bros. Circus,[52] the defendants operated a traveling circus that employed the plaintiffs' 15-year-old son without their permission. The defendants' knowledge of the son's minor status and failure to obtain the parents' consent for employing him were sufficient to establish their liability. But we remanded the cause to determine if the parents had ratified the employment, and thereby waived the claim, by accepting money from the son's employment with the defendants.
Also, Neb.Rev.Stat. § 28-316 (Reissue 2008) provides a criminal sanction for interfering with a legal guardian's custody of a minor child. Similarly, the Restatement (Second) of Torts § 700[53] recognizes that a parent legally entitled to a child's custody may recover against a person who deprives him or her of custody. Under both Tavlinsky and § 700 of the Restatement, however, the parent seeking relief must show that he or she is legally entitled to custody.
However, remember that Ashby was not entitled to custody before April 21, 2004, when he received a custody order from the Madison County Court. But Ashby's allegations focus on the defendants' actions before he obtained the custody order. And after April 21, the record shows that the Blacks successfully exercised their right to appeal.[54] Ashby was a party to the appeal, but because Ashby's Nebraska custody order did not comply with the requirements of Alabama's or Nebraska's Uniform Child Custody Jurisdiction and Enforcement Act[55] or the Parental Kidnapping Prevention Act of 1980,[56] the Supreme Court of Alabama refused to enforce the Nebraska custody order.[57] Contrary to Ashby's allegations, the defendants, in exercising their lawful right to appeal, were not wrongfully depriving Ashby of custody. And his allegations do not support a claim that the defendants' actions after April 21 showed an implied agreement to deprive him of his parental rights. In sum, the defendants did not wrongfully interfere with Ashby's ability to establish and assert his parental rights.
Ashby's allegations are more accurately characterized as attempting to state a claim for interference with his right to establish paternity and obtain custody. Based on the language of § 700,[58] however, we do not believe that a biological father can assert a claim for intentional interference with his parental rights before gaining a custody order.[59] Because Ashby cannot allege that he was legally entitled to custody at the time of the alleged interference, *359 he cannot allege facts showing this required element of intentional interference with a parental relationship. And because he cannot allege facts that would satisfy the required elements of the tort, he cannot establish a conspiracy claim based upon that tort.[60] Moreover, as of March 30, 2004, Ashby was actively litigating in Alabama whether his custody order was, in fact, valid and enforceable.[61] Thus, the district court properly granted summary judgment to Kilmer, the Blacks, Washburn, and Erickson & Sederstrom.

PERSONAL JURISDICTION OVER WHITMIRE
Whitmire, the Blacks' attorney, argues that the district court lacked personal jurisdiction over him because there were insufficient minimum contacts between him and Nebraska. He contends that summoning him to court in Nebraska would offend traditional notions of fair play and substantial justice. Ashby contends that the issue is not properly before us because the district court did not rule on personal jurisdiction and Whitmire did not raise the issue separately through a cross-appeal. But a review of the record shows that Whitmire moved to dismiss for lack of personal jurisdiction and for failure to state a claim for which relief can be granted, and he submitted no evidence at the hearings on the motion. The other defendants all submitted evidence on supporting their motions to dismiss that converted the motions into summary judgments[62]; Whitmire did not.[63] Nor did he seek any affirmative relief or defend on the merits.[64] And we have previously held that a court should determine whether it has personal jurisdiction before considering whether a complaint fails to state a cause of action under Neb. Ct. R. Pldg. § 6-1112(b)(6).[65] Only if the court rejects the jurisdictional objections should it address the objection that the complaint fails to state a claim upon which it can grant relief.[66] So we believe that the district court should have determined whether it had personal jurisdiction over Whitmire before addressing the merits of the case.
Personal jurisdiction is the power of a tribunal to subject and bind a particular person or entity to its decisions.[67] Before a court can exercise personal jurisdiction over a nonresident defendant, the court must first determine whether the long-arm statute is satisfied.[68] If the long-arm statute is satisfied, the second question is whether minimum contacts exist between the defendant and the forum state for personal jurisdiction over the defendant without offending due process.[69]
Our inquiry begins with Nebraska's long-arm statute, Neb.Rev.Stat. § 25-536 (Reissue 2008). It extends Nebraska's jurisdiction over nonresidents having any contact with or maintaining any relation to this state as far as the federal Constitution *360 permits.[70] So we look to whether a Nebraska court's exercise of jurisdiction over Whitmire would be consistent with due process.[71]
First, we address whether Whitmire had sufficient minimum contacts with Nebraska necessary to satisfy due process.[72] Due process requires that a defendant's minimum contacts with the forum state be such that "`"maintenance of the suit does not offend `traditional notions of fair play and substantial justice.'"'"[73] We look at the quality and type of Whitmire's activities.
Depending on the facts of a case, a court can exercise two types of jurisdiction: general personal jurisdiction or specific personal jurisdiction.[74] General personal jurisdiction arises from the defendant's "`"`continuous and systematic general business contacts'"'" with the forum state.[75] Ashby does not claim that the court had general personal jurisdiction over Whitmire. If the defendant's contacts are neither substantial nor continuous and systematic, but the cause of action arises out of or is related to the defendant's contact with the forum, a court may assert specific jurisdiction over the defendant, depending on the quality and nature of such contact.[76] Ashby contends that allegations of a civil conspiracy involving Whitmire can support the exercise of specific personal jurisdiction.
In determining conspiracy liability, the actions of one coconspirator are attributable to all coconspirators.[77] So some courts have reasoned that if through one of its members a conspiracy inflicts an actionable wrong in one jurisdiction, the other members should not be allowed to escape being sued there by hiding in another jurisdiction.[78] Under a coconspirator theory of jurisdiction, the actions of one conspirator are attributable to all the coconspirators for assessing jurisdictional contacts.[79]
Ashby alleges that the Blacks, Whitmire's clients and alleged coconspirators, came to Nebraska and absconded with Ashby's son, interfering with Ashby's parental relationship. He contends that although Whitmire never entered Nebraska, because his alleged coconspirators committed acts in furtherance of the conspiracy in Nebraska, he is subject to the jurisdiction of a Nebraska court.
We have not recognized whether a civil conspiracy can support the exercise of personal jurisdiction. Nor are we inclined to do so at this time. Due process for personal jurisdiction over a nonresident defendant requires that the plaintiff allege specific acts by the defendant which establish that the defendant had the necessary minimum contacts before a Nebraska court can exercise jurisdiction over a person.[80] *361 Without minimum contacts, a Nebraska court cannot exercise jurisdiction over Whitmire without violating his right to due process. The difficulty with establishing personal jurisdiction based on an alleged conspiracy is that it merges the jurisdiction issue with the merits of the case. As noted by the Seventh Circuit:
It would be more than awkward to postpone the jurisdictional issue to the merits; it would dissolve the issue. If the plaintiff won on the merits, the jurisdictional issue would be automatically resolved in his favor, while if he lost the defendant would waive the defense of personal jurisdiction and take the judgment for its preclusive value in subsequent suits. But to resolve the jurisdictional issue in advance would require... an evidentiary hearing as extensive as, and in fact duplicative of, the trial on the meritseither that or permit a nonresident to be dragged into court on mere allegations.[81]
Ashby's allegations regarding Whitmire's involvement in the alleged conspiracy are insufficient to show minimal contacts. He focuses only on acts that took place in Alabama. Ashby alleges that the Blacks' removal of M.A. from Nebraska is the central act that furthered the conspiracy. But regarding Whitmire's actions, Ashby claims only that Whitmire made false representations to, and withheld information from, the Alabama courts regarding M.A.'s paternity. He makes no allegations regarding Whitmire's involvement with any of the proceedings in Nebraska. And based upon these allegations, we do not believe Whitmire's connection to Nebraska rises to the level that he should have anticipated being haled into court here. To hold otherwise would, we believe, offend notions of fair play and substantial justice, and would violate due process.
Although the district court failed to make this determination, we conclude the record is sufficient to show that the court improperly exercised personal jurisdiction over Whitmire.

DISCOVERY ARGUMENTS
Because the court lacked personal jurisdiction, Ashby's assignment of error regarding his motion to compel Whitmire to answer discovery questions is not before us. And while Ashby also argues that the Blacks and Erickson & Sederstrom's designated attorney should be compelled to answer questions regarding both Whitmire's representation of the Blacks and Washburn's representation of Kilmer, we do not consider issues which Ashby argued but has not assigned.[82]

CONCLUSION
We conclude that the district court lacked jurisdiction over Whitmire and that the district court properly dismissed Ashby's claims against the remaining defendants.
AFFIRMED.
WRIGHT, J., not participating.
NOTES
[1] See Neb.Rev.Stat. § 43-104.04 (Reissue 2004).
[2] Neb.Rev.Stat. §§ 43-1101 and 43-1102 (Reissue 2008).
[3] See Neb.Rev.Stat. §§ 43-104.01(2) and 43-104.03 (Reissue 2004).
[4] See Neb.Rev.Stat. § 43-104.15 (Reissue 2008).
[5] See Ex parte D.B. and T.B., 975 So.2d 940 (Ala.2007), affirming D.B. v. M.A., 975 So.2d 927 (Ala.Civ.App.2006). See, also, Neb.Rev. Stat. §§ 43-1226 to 43-1266 (Reissue 2004).
[6] See 28 U.S.C. § 1738A and 42 U.S.C. § 663 (2006).
[7] Ex parte D.B. and T.B., supra note 5.
[8] See Ashby v. Dyer, 427 F.Supp.2d 929 (D.Neb.2006).
[9] Id.
[10] Id. at 934.
[11] See Holmstedt v. York Cty. Jail Supervisor, 275 Neb. 161, 745 N.W.2d 317 (2008).
[12] Wilke v. Woodhouse Ford, 278 Neb. 800, 774 N.W.2d 370 (2009). See, also, Nebraska Coalition for Ed. Equity v. Heineman, 273 Neb. 531, 731 N.W.2d 164 (2007).
[13] Wilke, supra note 12.
[14] Neb.Rev.Stat. §§ 81-8,209 to 81-8,235 (Reissue 2003).
[15] See Ehlers v. State, 276 Neb. 605, 756 N.W.2d 152 (2008).
[16] Fickle v. State, 273 Neb. 990, 735 N.W.2d 754 (2007).
[17] Munstermann v. Alegent Health-Immanuel Medical Center, 271 Neb. 834, 845, 716 N.W.2d 73, 83 (2006).
[18] Fickle, supra note 16.
[19] Reply brief for appellants at 7.
[20] 2009 Neb. Laws, L.B. 237, § 3.
[21] Reply brief for appellants at 7. See § 43-1101, art. V(a).
[22] See, Troxel v. Granville, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982).
[23] § 43-1101, art. II(b).
[24] Cornhusker Christian Ch. Home v. Dept. of Soc. Servs., 229 Neb. 837, 429 N.W.2d 359 (1988).
[25] Neb.Rev.Stat. §§ 43-104.13 and 43-104.14 (Reissue 2004).
[26] Neb.Rev.Stat. § 43-104.12 (Reissue 2004).
[27] § 43-104.14(1).
[28] Neb.Rev.Stat. § 43-104.16 (Reissue 2008).
[29] § 43-104.15.
[30] Id.
[31] Id.
[32] § 43-1101, art. III(a) and (b).
[33] See, Estate of McElwee v. Omaha Transit Auth., 266 Neb. 317, 664 N.W.2d 461 (2003); City of Omaha v. Kum & Go, 263 Neb. 724, 642 N.W.2d 154 (2002).
[34] See Fickle, supra note 16.
[35] Ashby, supra note 8.
[36] Id., citing Davis v. Fulton County, Ark., 90 F.3d 1346 (8th Cir. 1996). See, also, Daniels v. Williams, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986).
[37] See Holmstedt, supra note 11.
[38] West v. Atkins, 487 U.S. 42, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988).
[39] See, Daniels, supra note 36; 15 Am. Jur. 2d Civil Rights § 69 (2000).
[40] See Daniels, supra note 36.
[41] See Holmstedt, supra note 11.
[42] See, Williams v. Baird, 273 Neb. 977, 735 N.W.2d 383 (2007); Shearer v. Leuenberger, 256 Neb. 566, 591 N.W.2d 762 (1999), disapproved on other grounds, Simon v. City of Omaha, 267 Neb. 718, 677 N.W.2d 129 (2004).
[43] See, In re Trust Created by Cease, 267 Neb. 753, 677 N.W.2d 495 (2004); Wasikowski v. Nebraska Quality Jobs Bd., 264 Neb. 403, 648 N.W.2d 756 (2002).
[44] See, Lamar Co. v. City of Fremont, 278 Neb. 485, 771 N.W.2d 894 (2009); Four R Cattle Co. v. Mullins, 253 Neb. 133, 570 N.W.2d 813 (1997).
[45] See Four R Cattle Co., supra note 44.
[46] See id.
[47] Eicher v. Mid America Fin. Invest. Corp., 275 Neb. 462, 748 N.W.2d 1 (2008).
[48] Id.
[49] Hatcher v. Bellevue Vol. Fire Dept., 262 Neb. 23, 628 N.W.2d 685 (2001).
[50] Brief for appellants at 38.
[51] Tavlinsky v. Ringling Bros. Circus, 113 Neb. 632, 204 N.W. 388 (1925).
[52] Id.
[53] Restatement (Second) of Torts § 700 (1977).
[54] See Ex parte D.B. and T.B., supra note 5.
[55] See, Ala.Code §§ 30-3B-101 to 30-3B-405 (West Cum. Supp. 2009); §§ 43-1226 to 43-1266.
[56] See 28 U.S.C. § 1738A and 42 U.S.C. § 663.
[57] See Ex parte D.B. and T.B., supra note 5.
[58] Restatement (Second) of Torts, supra note 53.
[59] But see Kessel v. Leavitt, 204 W.Va. 95, 511 S.E.2d 720 (1998).
[60] Hatcher, supra note 49.
[61] See Ex parte D.B. and T.B., supra note 5.
[62] See Nebraska Coalition for Ed. Equity, supra note 12.
[63] See 5 John P. Lenich, Nebraska Civil Procedure § 11.5 (2008).
[64] See Neb.Rev.Stat. § 25-516.01(2) (Reissue 2008).
[65] Holmstedt, supra note 11.
[66] Id.
[67] S.L. v. Steven L., 274 Neb. 646, 742 N.W.2d 734 (2007).
[68] See id. See, also, Kugler Co. v. Growth Products Ltd., 265 Neb. 505, 658 N.W.2d 40 (2003).
[69] Kugler Co., supra note 68.
[70] S.L., supra note 67.
[71] Id.
[72] Id.
[73] Id. at 651-52, 742 N.W.2d at 741.
[74] Id.
[75] Id. at 652, 742 N.W.2d at 741.
[76] Id.
[77] See Stillinger & Napier v. Central States Grain Co., Inc., 164 Neb. 458, 82 N.W.2d 637 (1957).
[78] See Stauffacher v. Bennett, 969 F.2d 455 (7th Cir. 1992) (superseded by Fed.R.Civ.P. 4(k)(2) as stated in Central States v. Reimer Express World Corp., 230 F.3d 934 (7th Cir. 2000)).
[79] See In re New Motor Vehicles Canadian Export, 307 F.Supp.2d 145 (D.Me.2004).
[80] See S.L., supra note 67. See, also, Internat. Shoe Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945).
[81] Stauffacher, supra note 78, 969 F.2d at 459.
[82] Vokal v. Nebraska Acct. & Disclosure Comm., 276 Neb. 988, 759 N.W.2d 75 (2009); Agena v. Lancaster Cty. Bd. of Equal., 276 Neb. 851, 758 N.W.2d 363 (2008).