Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
04/06/2018 09:17 AM CDT

JOHN C. NIMMER, APPELLANT, V.
GIGA ENTERTAINMENT MEDIA, INC., APPELLEE.
___ N.W.2d ___

Filed January 12, 2018.    No. S-17-070.

1. **Judgments: Appeal and Error.** When a jurisdictional question does not involve a factual dispute, the issue is a matter of law. An appellate court reviews questions of law independently of the lower court's conclusion.

2. **Jurisdiction: Rules of the Supreme Court: Pleadings: Appeal and Error.** When reviewing an order dismissing a party from a case for lack of personal jurisdiction under Neb. Ct. R. Pldg. § 6-1112(b)(2), an appellate court examines the question of whether the nonmoving party has established a prima facie case of personal jurisdiction de novo.

3. **Motions to Dismiss: Appeal and Error.** In reviewing the grant of a motion to dismiss, an appellate court must look at the facts in the light most favorable to the nonmoving party and resolve all factual conflicts in favor of that party.

4. **Jurisdiction: Words and Phrases.** Personal jurisdiction is the power of a tribunal to subject and bind a particular entity to its decisions.

5. **Due Process: Jurisdiction: States.** Before a court can exercise personal jurisdiction over a nonresident defendant, the court must determine, first, whether the long-arm statute is satisfied and, if the long-arm statute is satisfied, second, whether minimum contacts exist between the defendant and the forum state for personal jurisdiction over the defendant without offending due process.

6. **Constitutional Law: Jurisdiction: States.** Nebraska's long-arm statute, Neb. Rev. Stat. § 25-536 (Reissue 2016), extends Nebraska's jurisdiction over nonresidents having any contact with or maintaining any relation to this state as far as the U.S. Constitution permits.

7. **Due Process: Jurisdiction: States.** If the long-arm statute has been satisfied, a court must then determine whether minimum contacts exist between the defendant and the forum state for personal jurisdiction over the defendant without offending due process.

8.  \_\_\_\_: \_\_\_\_: \_\_\_\_. The benchmark for determining if the exercise of personal jurisdiction satisfies due process is whether the defendant's minimum contacts with the forum state are such that the defendant should reasonably anticipate being haled into court there.

9.  \_\_\_\_: \_\_\_\_: \_\_\_\_. Due process for personal jurisdiction over a nonresident defendant requires that the defendant's minimum contacts with the forum state be such that maintenance of the suit does not offend traditional notions of fair play and substantial justice.

10. **Due Process: Jurisdiction: States: Appeal and Error.** In analyzing personal jurisdiction, an appellate court considers the quality and type of the defendant's activities to decide whether the defendant has the necessary minimum contacts with the forum state to satisfy due process.

11. **Jurisdiction: States.** Whether a forum state court has personal jurisdiction over a nonresident defendant depends on whether the defendant's actions created substantial connections with the forum state, resulting in the defendant's purposeful availment of the forum state's benefits and protections.

12. \_\_\_\_: \_\_\_\_. The purposeful availment requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or a third person. Jurisdiction is proper, however, where the contacts proximately result from actions by the defendant himself or herself that create a substantial connection with the forum state.

13. \_\_\_\_: \_\_\_\_. A court exercises two types of personal jurisdiction depending upon the facts and circumstances of the case: general personal jurisdiction or specific personal jurisdiction.

14. \_\_\_\_: \_\_\_\_. To satisfy general personal jurisdiction, the plaintiff's claim does not have to arise directly out of the defendant's contacts with the forum state if the defendant has engaged in continuous and systematic general business contacts with the forum state.

15. \_\_\_\_: \_\_\_\_. If the defendant's contacts are neither substantial nor continuous and systematic, but the cause of action arises out of or is related to the defendant's contact with the forum, a court may assert specific jurisdiction over the defendant, depending on the quality and nature of such contact.

Appeal from the District Court for Sarpy County: David K. Arterburn, Judge. Affirmed as modified.

John C. Nimmer, of Nimmer Law Office, pro se.

Clarence E. Mock, of Johnson & Mock, P.C., L.L.O., for appellee.

Heavican, C.J., Wright, Miller-Lerman, Cassel, Stacy, Kelch, and Funke, JJ.

Heavican, C.J.

## I. INTRODUCTION

John C. Nimmer, a licensed attorney, began providing legal representation for Digital Broadcasting Corporation (DBC) in 1995. In 2012, DBC merged with Giga Entertainment Media, Inc. (GEM), whereby GEM became the surviving corporation. DBC shareholders received a single share of GEM in exchange for each share owned in DBC.

In 2015, Nimmer withdrew from representation of DBC. Upon resigning from representation, Nimmer made a demand on GEM for cash legal fees and a repurchase of DBC common shares. After the parties failed to reach a settlement, Nimmer, acting pro se, filed a claim of breach of contract against GEM. GEM filed a motion to dismiss for lack of personal jurisdiction.

Following a hearing, the trial court granted GEM's motion to dismiss for lack of personal jurisdiction and dismissed Nimmer's complaint with leave to amend the complaint. Nimmer filed an amended complaint that included additional claims for tortious conversion and a violation of Nebraska's Uniform Deceptive Trade Practices Act.[1] GEM filed a second motion to dismiss for lack of personal jurisdiction. The district court granted GEM's motion to dismiss for lack of personal jurisdiction and dismissed Nimmer's complaint with prejudice. Nimmer appeals. We affirm as modified.

## II. BACKGROUND

### 1. Factual Background

Nimmer stated in his affidavit that he has provided legal services to DBC and its affiliates since April 1995, in exchange for DBC common shares and cash compensation. DBC was

---

[1] See Neb. Rev. Stat. §§ 87-301 to 87-306 (Reissue 2014 & Cum. Supp. 2016).

a Delaware corporation with its home offices formerly in Nassau County, New York, and is now dissolved. According to Nimmer, he provided legal services to "Sky Cable, LLC," one of DBC's affiliates that is now a dissolved Nevada business entity, with its former home office in Omaha, Nebraska.

Nimmer attached extensive documentation to his affidavit regarding any contact he had with DBC and GEM in addition to any document referencing both DBC and GEM. Among those documents is a June 24, 2008, letter that Nimmer sent to Gary Nerlinger, chairman of DBC, confirming the understanding that the agreement for the performance of legal services to DBC

> shall be governed by, and construed and enforced in accordance with, the laws of the State of Nebraska. [DBC] hereby irrevocably submits to the jurisdiction of any federal or state courts of the State of Nebraska for purpose of any suit, action, or other proceeding arising out of this letter Agreement.

Nerlinger signed the letter as accepted.

Also attached to Nimmer's affidavit are the minutes for a June 1, 2012, DBC board of directors telephonic meeting in which DBC's board of directors approved a statutory merger of DBC's assets with GEM. Nimmer averred in his affidavit that "[a]fter GEM's creation in May 2012 by DBC[, Nimmer] continued to e-mail itemized billing statements for overlapping DBC and GEM legal work to the same persons addressed to 'DBC and Affiliates'." On August 30, Charles Noska, GEM's vice president of logistic integration, sent an email from a GEM email account to "DBC and now [GEM] Investors," informing them that "[DBC] has been transformed formally into . . . GEM." The email also included an attached "copy of the GEM Business Plan." On September 26, Noska sent another email concerning the GEM business plan, with the subject line "GEM (formerly DBC) Index for Substantiating Articles and Research."

Lawrence W. Silver, vice president of GEM, stated in his affidavit that GEM is a Nevada corporation with its

principal place of business in New York. GEM has no offices in Nebraska; owns no property in Nebraska; generates no revenue in Nebraska; maintains no corporate records in Nebraska; and has no employees, officers, or directors in Nebraska. Silver also stated that since GEM's formation in 2012, there has not been a single instance in which a GEM employee, officer, or director traveled to Nebraska on company business or has otherwise been in Nebraska for any purpose relating in any way to GEM's business activities. GEM has not contracted to supply goods or services in Nebraska, nor registered with the Secretary of State to do business in Nebraska.

On April 1, 2015, GEM mailed a letter to DBC shareholders, directing them to surrender their DBC shares in order to be issued shares in GEM. The process set forth in the letter required DBC shareholders to send their certificates to GEM. DBC notified shareholders that "[t]he DBC certificates will be copied, recorded and forwarded to legal counsel, . . . Nimmer[,] by our administrative division."

On July 8, 2015, Nimmer emailed Noska to inform him that he, Nimmer, refused to surrender his DBC certificates. On November 12, Nimmer withdrew from his representation of DBC.

In an email dated November 15, 2015, GEM's outside counsel, Abram Pafford, stated:

[I]f you want to send proposed stipulation language stating that GEM agrees to Nebraska as a forum for any litigation between itself and Nimmer Law Office, and that GEM agrees it is responsible for any legal fee invoices determined by a court to be owed by DBC to Nimmer Law Office, I will send it to the company and probably recommend that the Board agree to it.

My recommendation would be based on my understanding that without regard to corporate form, there have at least been verbal agreements and a course of dealing between GEM and Nimmer Law Office whereby GEM agreed to assume responsibility for the unpaid balance of legal fees owed by DBC to Nimmer Law Office.

In an email from Pafford to Nimmer later that same day, Pafford stated:

> Since you cannot be bothered with proposing stipulation language, and since you ignored my email indicating that I was authorized to act for the company on the limited issue of appropriate stipulation language, here is the language I would propose:
>
> "The Parties stipulate that Nebraska is the proper venue for this litigation, and that the Nebraska courts can properly exercise personal jurisdiction over GEM."

In a November 17 email, Pafford stated that "[GEM] has offered a stipulation that would cover the issues of Nebraska venue and successor liability for your legal fees in a straightforward manner. . . . If you choose to file suit without responding to the proposed stipulation that is up to you . . . ."

After the parties failed to reach a settlement, Nimmer, acting pro se, filed claims of breach of contract for failing to repurchase Nimmer's 584,500 DBC common shares and sought the value of those shares based upon a share price at the time of the merger.

## 2. PROCEDURAL BACKGROUND

On October 28, 2016, Nimmer filed a verified amended complaint. In his amended complaint, Nimmer alleged that GEM is the successor of DBC and that thus, DBC's actions are ascribable to GEM for purposes of personal jurisdiction, because (1) Nimmer's monthly billing statements for legal representation were addressed to "'DBC and Affiliates'" and later to "'GEM/DBC and Affiliates'" and sent to the same persons; (2) DBC stated to Nimmer that it would merge with GEM and that GEM would automatically acquire DBC's assets and would remain responsible for DBC's financial obligations; (3) GEM changed plans to instead cause a share-for-share exchange, after which DBC would be dissolved; (4) the April 1, 2015, letter from GEM to DBC shareholders requested DBC shareholders to surrender DBC stock certificates to GEM which would be forwarded to Nimmer as GEM's legal counsel;

(5) Nimmer demanded cash legal fees and DBC common shares upon resigning from further representation of GEM, and GEM agreed to a payment plan of legal fees but Nimmer has not agreed to a share repurchase plan; (6) GEM's legal counsel stipulated to a Nebraska venue in an email to Nimmer; (7) both entities have been under common control because there is substantial overlap among DBC's former owners, management, attorneys, accountants, agents, and consultants and those in GEM; (8) GEM has admitted that it is DBC's successor in interest in (a) early GEM shareholder updates sent to DBC shareholders by Noska, "an officer/director of both DBC and GEM, on behalf of GEM from a GEM e-mail account e-mailed DBC shareholders," and once referred to "'DBC and now [GEM] Investors,'" and once stated in the subject line "'[GEM] (formerly DBC) Sept 26 2012 update,'" (b) an April 1, 2015, email sent by GEM to DBC shareholders requiring that they exchange DBC shares for GEM shares, and (c) a November 13, 2015, screenshot of GEM's website in which GEM describes its beginnings as involving "digital wireless television systems and FCC bandwidth licenses," which is what DBC and its affiliates had done and not what GEM did; (9) Nerlinger controlled both DBC and GEM by (a) recommending all officer and board member candidates to Silver, who then appointed those candidates, (b) directing the current GEM "initial public offering" process, (c) directing significant changes to DBC's and GEM's business models, (d) directing day-to-day operations, (e) attending and directing board of directors meetings, (f) conducting conference calls for investors, (g) negotiating and consummating contracts that were signed by other officers and directors, (h) receiving substantial equity ownership, (i) claiming in agreements disclosed in litigation that he is the founder of GEM, (j) "'cherry pick[ing]'" which GEM shareholders received updates about GEM, (k) serving as Nimmer's primary point of contact for legal representation of DBC and GEM, and (l) routinely exceeding his scope as a consultant to GEM; (10) Nimmer provided legal representation to one of DBC's affiliates, Sky Cable, which had its former home offices

in Omaha commencing in 1995 until Sky Cable's dissolution; (11) for the duration of Nimmer's representation of DBC and GEM, DBC and GEM have issued and sold their own securities and have substantially overlapping management as is apparent from their public filings; (12) a February 5, 2002, fee agreement between Nimmer and DBC provided that "'venue for all fee matters will continue to be conferred specifically upon Nebraska'"; (13) the February 5, 2002, and June 24, 2008, fee agreements between Nimmer and DBC provided that venue was proper in Nebraska and that the laws of Nebraska applied; (14) DBC expressly admitted in previous litigation that while it was a Delaware corporation with its home offices in New York, it conducts business in Nebraska; (15) Nimmer provided litigation and nonlitigation services for DBC in Nebraska; and (16) Nerlinger made several trips to Nebraska related to legal services provided by Nimmer.

Nimmer also contended that GEM's actions, standing alone, confer personal jurisdiction, because (1) GEM's retention of Nimmer as legal counsel from May 2012 until November 2015 constituted sufficient minimum contacts; (2) GEM's legal counsel stipulated to a Nebraska venue in response to Nimmer's demands for cash payment for legal fees; and (3) Nimmer's claims of tortious conversion and violation of the Uniform Deceptive Trade Practices Act constitute tortious acts by GEM that are intentional, directed at Nebraska, and knowingly cause harm to Nimmer in Nebraska, thereby constituting sufficient specific minimum contacts with Nebraska.

On January 12, 2017, the district court granted GEM's motion to dismiss, finding that the court lacked personal jurisdiction over GEM.[2] The court noted that the "factual allegations on which [Nimmer] relies include contacts from 15 to 20 years ago, a forum selection clause from a 2008 fee agreement between [Nimmer] and DBC, and the fact that [Nimmer] had provided legal services to GEM," and that such

---

[2] See Neb. Ct. R. Pldg. § 6-1112(b)(2). See, generally, § 6-1112(b).

was insufficient to constitute the requisite minimum contacts between GEM and Nebraska. Nimmer appeals.

## III. ASSIGNMENTS OF ERROR

Nimmer assigns, restated, that the trial court erred in (1) finding that Nebraska did not have personal jurisdiction over GEM and (2) dismissing Nimmer's complaint with prejudice.

## IV. STANDARD OF REVIEW

[1,2] When a jurisdictional question does not involve a factual dispute, the issue is a matter of law. An appellate court reviews questions of law independently of the lower court's conclusion.[3] When reviewing an order dismissing a party from a case for lack of personal jurisdiction under § 6-1112(b)(2), an appellate court examines the question of whether the nonmoving party has established a prima facie case of personal jurisdiction de novo.[4]

[3] In reviewing the grant of a motion to dismiss, an appellate court must look at the facts in the light most favorable to the nonmoving party and resolve all factual conflicts in favor of that party.[5]

## V. ANALYSIS

[4,5] Nimmer argues that the district court erred in finding that the court lacked personal jurisdiction over GEM. Personal jurisdiction is the power of a tribunal to subject and bind a particular entity to its decisions.[6] Before a court can exercise personal jurisdiction over a nonresident defendant, the court must determine, first, whether the long-arm statute is satisfied and, if the long-arm statute is satisfied, second, whether minimum contacts exist between the defendant and

---

[3] *S.L. v. Steven L.*, 274 Neb. 646, 742 N.W.2d 734 (2007).

[4] *VKGS v. Planet Bingo*, 285 Neb. 599, 828 N.W.2d 168 (2013).

[5] *RFD-TV v. WildOpenWest Finance*, 288 Neb. 318, 849 N.W.2d 107 (2014).

[6] *In re Petition of SID No. 1*, 270 Neb. 856, 708 N.W.2d 809 (2006).

the forum state for personal jurisdiction over the defendant without offending due process.[7]

On appeal, Nimmer makes three primary arguments regarding personal jurisdiction. Nimmer first argues that specific personal jurisdiction exists over GEM because of GEM's tortious conversion and the Uniform Deceptive Trade Practices Act claims. Nimmer also argues that general personal jurisdiction exists over GEM because of Nimmer's provision of legal advice to GEM. Alternatively, Nimmer argues that general personal jurisdiction exists over GEM due to the actions of GEM's "alter ego predecessor DBC."[8]

## 1. Long-Arm Statute

[6] Nebraska's long-arm statute, Neb. Rev. Stat. § 25-536 (Reissue 2016), extends Nebraska's jurisdiction over nonresidents having any contact with or maintaining any relation to this state as far as the U.S. Constitution permits.[9] Therefore, the issue is whether GEM had sufficient contacts with Nebraska so that the exercise of personal jurisdiction would not offend federal principles of due process.[10]

## 2. Minimum Contacts

[7-9] If the long-arm statute has been satisfied, a court must then determine whether minimum contacts exist between the defendant and the forum state for personal jurisdiction over the defendant without offending due process.[11] The benchmark for determining if the exercise of personal jurisdiction satisfies due process is whether the defendant's minimum contacts with the forum state are such that the defendant should reasonably anticipate being haled into court there.[12]

---

[7] *S.L. v. Steven L., supra* note 3.

[8] Brief for appellant at 14.

[9] *VKGS v. Planet Bingo, supra* note 4.

[10] See *Erickson v. U-Haul Internat.*, 274 Neb. 236, 738 N.W.2d 453 (2007).

[11] *Id.*

[12] *Id.*

Due process for personal jurisdiction over a nonresident defendant requires that the defendant's minimum contacts with the forum state be such that "'maintenance of the suit does not offend "traditional notions of fair play and substantial justice."'"[13]

[10-12] In analyzing personal jurisdiction, we consider the quality and type of the defendant's activities to decide whether the defendant has the necessary minimum contacts with the forum state to satisfy due process.[14] Whether a forum state court has personal jurisdiction over a nonresident defendant depends on whether the defendant's actions created substantial connections with the forum state, resulting in the defendant's purposeful availment of the forum state's benefits and protections.[15] The "purposeful availment" requirement "'ensures that a defendant will not be haled into a jurisdiction solely as a result of "random," "fortuitous," or "attenuated" contacts . . . or of the "unilateral activity of another party or a third person."'"[16] Jurisdiction is proper, however, where the contacts proximately result from actions by the defendant himself or herself that create a """substantial connection""" with the forum state.[17]

[13-15] A court exercises two types of personal jurisdiction depending upon the facts and circumstances of the case: general personal jurisdiction or specific personal jurisdiction.[18] To satisfy general personal jurisdiction, the plaintiff's claim does not have to arise directly out of the defendant's contacts with the forum state if the defendant has engaged in """continuous and systematic general business contacts""" with the forum

---

[13] *Quality Pork Internat. v. Rupari Food Servs.*, 267 Neb. 474, 481, 675 N.W.2d 642, 649 (2004), quoting *Internat. Shoe Co. v. Washington*, 326 U.S. 310, 66 S. Ct. 154, 90 L. Ed. 95 (1945).

[14] *S.L. v. Steven L., supra* note 3.

[15] *Erickson v. U-Haul Internat., supra* note 10.

[16] *S.L. v. Steven L., supra* note 3, 274 Neb. at 653, 742 N.W.2d at 741.

[17] *Id.*

[18] *Erickson v. U-Haul Internat., supra* note 10.

state.[19] If the defendant's contacts are neither substantial nor continuous and systematic, but the cause of action arises out of or is related to the defendant's contact with the forum, a court may assert specific jurisdiction over the defendant, depending on the quality and nature of such contact.[20]

### (a) Specific Personal Jurisdiction Over GEM

Nimmer first argues that because his claims of tortious conversion and violation of the Uniform Deceptive Trade Practices Act are intentional torts, specific personal jurisdiction over GEM exists. GEM contends that Nimmer has cited no authority to support his assertions, nor does GEM have any meaningful contacts with Nebraska; thus, GEM is not subject to specific personal jurisdiction.

Nimmer cites to Neb. Rev. Stat. § 8-1112 (Reissue 2012), which states:

> Registering as a broker-dealer, issuer-dealer, agent, investment adviser, or investment adviser representative under the Securities Act of Nebraska or directly or indirectly offering a security or investment adviser services in this state shall constitute sufficient contact with this state for the exercise of personal jurisdiction over such a person in any action which arises under the act.

Nimmer relies heavily on *Abdouch v. Lopez*.[21] In *Abdouch*, the plaintiff filed suit against an out-of-state defendant and his company because the defendant attempted to sell a book through his company's website, which the plaintiff contended was a violation of her privacy rights. To determine whether specific personal jurisdiction in Nebraska existed over the company based on the online advertisement for the book, this court, in *Abdouch*, applied the test set forth by the U.S. Supreme Court in *Calder v. Jones*[22]:

---

[19] *Id*. at 249, 738 N.W.2d at 464.

[20] *S.L. v. Steven L., supra* note 3.

[21] *Abdouch v. Lopez*, 285 Neb. 718, 829 N.W.2d 662 (2013).

[22] *Calder v. Jones*, 465 U.S. 783, 104 S. Ct. 1482, 79 L. Ed. 2d 804 (1984).

"'[A] defendant's tortious acts can serve as a source of personal jurisdiction only where the plaintiff makes a prima facie showing that the defendant's acts (1) were intentional, (2) were uniquely or expressly aimed at the forum state, and (3) caused harm, the brunt of which was suffered—and which the defendant knew was likely to be suffered—[in the forum state].'"[23]

This court then quoted the Eighth Circuit Court, which held that it "'construe[s] the *Calder* effects test narrowly, and hold[s] that, absent additional contacts, mere effects in the forum state are insufficient to confer personal jurisdiction.'"[24] We accordingly held that the plaintiff failed to prove that Nebraska residents were targeted with the advertisement, because the advertisement did not "expressly direct its offer of sale to Nebraska."[25] We further explained that "the mention of Nebraska here is incidental and was not included for the purposes of having the consequences felt in Nebraska."[26] Furthermore, in response to the plaintiff's contention that she had a representative contact the defendant with her objection to his commercial use of her name and identity in his advertisement, this court emphasized that "'"it is essential in each case that there be *some act by which the defendant purposefully avails* itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws."'"[27]

In *RFD-TV v. WildOpenWest Finance*,[28] we addressed personal jurisdiction based on the enforceability of the arbitration clause in a contract. RFD-TV, LLC (RFD), a Nebraska

---

[23] *Abdouch v. Lopez, supra* note 21, 285 Neb. at 731, 829 N.W.2d at 674.

[24] *Id.* at 732, 829 N.W.2d at 675.

[25] *Id.* at 733, 829 N.W.2d at 675.

[26] *Id.*

[27] *Id.* at 734, 829 N.W.2d at 676 (emphasis in original), quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985).

[28] *RFD-TV v. WildOpenWest Finance, supra* note 5.

corporation, entered into an agreement with Sunflower Broadband Corporation (Sunflower) in which the parties agreed, among other things, to arbitration in Nebraska. Knology, Inc., a television provider, purchased the assets of Sunflower. Knology then became a wholly owned subsidiary of WOW! Cable (WOW). We found that RFD had "failed to make a prima facie case that [WOW and Knology] were subject to the arbitration clause."[29] We explained that WOW and Knology "were not signatories to the Sunflower Agreement" and that they "did not expressly assume the agreement when they purchased Sunflower's assets."[30] Furthermore, we addressed whether Nebraska had personal jurisdiction over WOW and Knology. We stated:

> Parties who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to regulation and sanctions in the other state for the consequences of their activities. Mail and telephone communications sent by a defendant into a forum may count toward the minimum contacts that support jurisdiction, but, as we noted in *Kugler Co. v. Growth Products Ltd.*, [265 Neb. 505, 658 N.W.2d 40 (2003),] the existence of a contract with a party in a forum state or the mere use of interstate facilities, such as telephones and mail, does not, in and of itself, provide the necessary contacts for personal jurisdiction. In *Kugler Co.*, we said we would also look at the prior negotiations between the parties and the contemplated consequences of their dealings.[31]

Accordingly, we held that while WOW and Knology paid licensing fees to a party in Nebraska, occasionally used telephone, email, and mail to discuss and pay invoices from RFD over the course of 2 years, actual business dealings between RFD and WOW and Knology were "extremely limited,"

---

[29] *Id.* at 327, 849 N.W.2d at 115.

[30] *Id.*

[31] *Id.* at 328, 849 N.W.2d at 115-16.

because WOW and Knology "paid to provide services based on terms negotiated by other parties."[32] Therefore, we dismissed the complaint for lack of personal jurisdiction.

Nimmer contends that GEM's tortious conversion and violation of the Uniform Deceptive Trade Practices Act were both a result of DBC's decision to do a share-for-share exchange with GEM rather than the initially agreed-upon statutory merger. Nimmer argues that this alleged deception gave shareholders, who had received the DBC shares on a tax-deferred basis, two unappealing options upon exchange: pay taxes on GEM shares or receive substitute GEM shares with lesser rights. Nimmer alleges that the tortious conversion and violation of the Uniform Deceptive Trade Practices Act were tortious acts by GEM that were intentional and directed at Nimmer in Nebraska, thereby constituting sufficient specific minimum contacts with Nebraska. Nimmer directs us to an April 1, 2015, "Dear Shareholder" letter from GEM and a June 4, 2015, email from GEM requesting Nimmer to sign the restricted stock award agreement as support for his contention that the contacts were directed at Nebraska.

We disagree that *Abdouch* is helpful to Nimmer's position. In *Abdouch*, we construed the *Calder* effects test[33] narrowly. In determining whether the plaintiff sufficiently alleged that the defendant's tortious acts were "'"uniquely or expressly aimed"'' at the forum state," this court found that the plaintiff did not make a prima facie showing, because she had failed to demonstrate "an intent to target and focus on Nebraska residents."[34] We find similarly here.

The April 1, 2015, letter was a generic email letter sent to all shareholders. As in *Abdouch*, Nimmer failed to demonstrate that GEM "had an intent to target and focus on Nebraska residents" with this generic email letter. Furthermore, this email letter indicates merely that GEM used Nimmer as

[32] *Id*. at 328, 849 N.W.2d at 116.

[33] See *Calder v. Jones, supra* note 22.

[34] *Abdouch v. Lopez, supra* note 21, 285 Neb. at 734, 829 N.W.2d at 675-76.

legal counsel and sent Nimmer a generic shareholder letter. Similar to the parties in *RFD-TV*, paying fees to a party in Nebraska, "occasionally us[ing] telephone, e-mail, and mail to discuss and pay invoices from RFD over the course of" several years is not sufficient when actual business dealings are "extremely limited."[35]

Nimmer has provided no other proof of his business dealings with GEM to supplement this correspondence, nor has Nimmer demonstrated how any tortious consequences of this letter were felt in Nebraska. In Nimmer's fee arrangement letters with DBC, he explains that he has a New York satellite office from which he also transacts business as a New York licensed attorney. Therefore, as in *Abdouch*, any impact upon Nimmer as a resident of Nebraska was "incidental."[36] This letter provides no basis in finding that GEM """"purposefully avail[ed] itself of the privilege of conducting activities"""" within Nebraska.[37]

We turn next to the June 4, 2015, email. We find that this email also does not serve as a basis for recovery for either tort claim. In contrast, we observe that this thread of emails provides a basis to find that GEM disclosed the change from a statutory merger to a share-for-share exchange and that Nimmer simply declined to sign the restricted stock agreement after being requested to do so. Therefore, Nimmer has failed to plead facts that demonstrate the cause of action for the tortious claims arising out of or related to GEM's June 4 email to Nimmer.

Finally, Nimmer does not explain how § 8-1112 is applicable to his claims. Nimmer merely states in his propositions of law that the offering of securities constitutes sufficient minimum contacts. He has not indicated that GEM is a registered broker-dealer in Nebraska or that GEM has "directly or

---

[35] See *RFD-TV v. WildOpenWest Finance, supra* note 5, 288 Neb. at 328, 849 N.W.2d at 116.

[36] See *Abdouch v. Lopez, supra* note 21, 285 Neb. at 733, 829 N.W.2d at 675.

[37] *Id.* at 734, 829 N.W.2d at 676 (emphasis omitted).

indirectly offer[ed] a security or investment adviser services" in Nebraska.[38] Nimmer has not established specific personal jurisdiction over GEM based solely based on tortious conduct directed at Nebraska.

### (b) Continued Retention of Nimmer

Nimmer next argues that GEM's continued retention of Nimmer for "transactional legal work from his Nebraska office constitutes sufficient minimum contacts with Nebraska to confer personal jurisdiction over GEM."[39] GEM argues that it "has never done business in Nebraska and has never had any meaningful operational or jurisdictional contacts of any kind within the state."[40]

In *Burger King Corp. v. Rudzewicz*,[41] a leading case on the issue of personal jurisdiction, the U.S. Supreme Court held that an individual's contract with an out-of-state party alone cannot "automatically establish sufficient minimum contacts in the other party's home forum."[42] Instead, the Court stated that courts must look at "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing" to determine whether the defendant purposefully established minimum contacts within the forum.[43]

Under this test, then, we must look to the terms of the contract and the parties' "actual course of dealing" to determine whether the defendant purposefully established minimum contacts within the forum.[44] In determining whether the legal services established minimum contacts in the forum, we analyze

---

[38] See § 8-1112.

[39] Brief for appellant at 16.

[40] Brief for appellee at 13.

[41] *Burger King Corp. v. Rudzewicz, supra* note 27.

[42] *Id.*, 471 U.S. at 478.

[43] *Id.*, 471 U.S. at 479.

[44] See *id.*

the "prior negotiations and contemplated future consequences" of the relationship of the two parties.[45]

*Thompson Hine, LLP v. Taieb*,[46] is relevant to this inquiry. In this case, the D.C. Circuit Court held that Washington, D.C., did not have personal jurisdiction over a Florida resident who retained lawyers in an Ohio law firm's Washington, D.C., office to represent him in a matter pending in Oregon. The court reasoned that "[a] non-resident's mere retention of a D.C.-based service provider, absent any other deliberate contact with the forum—demonstrated either by the terms of the contract itself or by the non-resident's actual dealings with the District—cannot qualify as a 'minimum contact.'"[47]

Nimmer is correct that while a contract alone does not establish minimum contacts, the establishment of a continuing relationship with obligations to the instate party could. But no contract between Nimmer and GEM exists in the record. Instead, Nimmer implies a contract by stating that GEM retained and utilized him for legal services from May 2012 until November 2015, and thereafter settled Nimmer's cash claim for legal fees.

Nimmer asserts in his amended complaint and brief that he represented GEM "from GEM's inception on May 12, 2012 without interruption until November 12, 2015." Nimmer further argues on appeal that his legal representation of GEM was composed of "legal advice, transactional work, securities law compliance, and legal advice regarding litigation."[48] It appears from Nimmer's amended complaint that he advised GEM on the disclosures for GEM's filings from 2013 through 2015. It also appears that Nimmer acted as legal counsel for GEM in anticipation of the statutory merger based on the "Dear Shareholder" letter, which states that Nimmer would receive

---

[45] See *id.*

[46] *Thompson Hine, LLP v. Taieb*, 734 F.3d 1187 (D.C. Cir. 2013).

[47] *Id.* at 1194.

[48] Brief for appellant at 12.

and record the DBC certificates. But, it is unclear from the record whether Nimmer performed this service, because he later emailed GEM stating that he did not receive any certificates. It is also unclear whether this service was for GEM or DBC. Thus, we are not persuaded that Nimmer has met his burden to show that any contract between himself and GEM was sufficient to support a finding of personal jurisdiction.

In this type of personal jurisdiction inquiry, courts also consider the timeframe of the alleged contacts. In *Johnson v. Woodcock*,[49] the Eighth Circuit held that "'[m]inimum contacts must exist either at the time the cause of action arose, the time the suit was filed, or within a reasonable period of time immediately prior to the filing of the lawsuit,'" and found that the contacts in that case, which occurred in the 1960's to 1980's, were not within a reasonable timeframe. The court additionally found that occasional correspondence between the parties was too attenuated to support a finding of personal jurisdiction.

Nimmer claims that he provided representation for Sky Cable, an affiliate of DBC located in Omaha. But by Nimmer's own admission, that representation occurred over 20 years ago and did not involve GEM. We conclude that the contacts between the forum state and Sky Cable are not within a reasonable timeframe of the current allegations and thus are not supportive of a finding of personal jurisdiction.

Nimmer has not shown that a substantial relationship existed between GEM and the forum state based on the legal services Nimmer provided to GEM. We agree with GEM that Nimmer has not provided any details as to whether his legal work for GEM pertained to disputes involving Nebraska, issues arising under Nebraska law, or any connection beyond the Nebraska location of one of his offices. As such, Nimmer provides no basis for an understanding of any services rendered to GEM in Nebraska. None of these contacts are such that GEM should reasonably anticipate being haled into

---

[49] *Johnson v. Woodcock*, 444 F.3d 953, 956 (8th Cir. 2006).

court in Nebraska. We find Nimmer's argument to be without merit.

### (c) General Personal Jurisdiction Over
### GEM—DBC's Alter Ego

Nimmer contends that "it is proper to ascribe the actions of [GEM's] alter ego predecessor DBC to GEM for general jurisdiction minimum contacts analysis."[50] In addition to the extensive list of reasons in Nimmer's amended complaint that GEM is DBC's predecessor, Nimmer contends in his brief that GEM is DBC's alter ego because (1) GEM was a creation of DBC for purposes of reincorporation in Delaware and a name change; (2) the ownership and management of GEM is the same as those of the former DBC, primarily through Nerlinger's sole control of each; and (3) GEM has made numerous admissions to DBC and GEM shareholders, and others, that GEM is a mere continuation of DBC.

Nimmer cites several cases to illustrate that courts have found successor corporations liable for the actions of a parent corporation based on the theories of corporate successor liability and contractual successor liability.[51] Nimmer contends that this court should apply those theories when ascribing minimum contacts for personal jurisdiction.

In support of Nimmer's argument for application of contractual successor liability to personal jurisdiction, Nimmer cites the Delaware Superior Court unpublished case *Universal Capital Mgmt., Inc. v. Micco World, Inc.*[52] In that case, the plaintiff entered into two contracts with a corporation which later merged into the defendant corporation. The two contracts stated that they were binding on the parties and their respective

---

[50] Brief for appellant at 16.

[51] See, *Pallas Shipping Agency, Ltd. v. Duris*, 461 U.S. 529, 103 S. Ct. 1991, 76 L. Ed. 2d 120 (1983); *Earl v. Priority Key Servs.*, 232 Neb. 584, 441 N.W.2d 610 (1989).

[52] *Universal Capital Mgmt., Inc. v. Micco World, Inc.*, No. 10C-07-039 RRC, 2011 WL 2347612 (Del. Super. June 2, 2011) (unpublished opinion).

successors. The court acknowledged that the corporate merger alone was insufficient to establish personal jurisdiction.[53] But the court looked at the defendant corporation's conduct and found that because it continued to operate under the terms of the contracts, personal jurisdiction existed.

Nimmer also cites *Clune v. Alimak AB*,[54] in which the Eighth Circuit found in a wrongful death action that personal jurisdiction existed over a parent corporation of a subsidiary that distributed a defective product. The court held that the contacts of the parent company and subsidiary were sufficient to establish minimum contacts in the forum state. The court emphasized that the parent company was a shell corporation that had no employees or products to sell.[55] We find that neither of these cases are persuasive under the facts of this case. Contrary to Nimmer's assertion, *Universal Capital Mgmt., Inc.* does not support the proposition that similar to successor contractual liability, a predecessor's contacts may be ascribed to its successor for personal jurisdiction. Instead, the court made clear that for purposes of personal jurisdiction, the court must analyze the contacts of the defendant corporation "in its own right," and whether it "continued to operate under the terms of the two contracts," causing injury in the forum state.[56] Furthermore, unlike in *Clune*, DBC is not the parent corporation of GEM, nor is GEM a shell company for purposes of DBC's liability. Therefore, the analysis in *Clune* is not relevant under these facts.

Instead, we find *Ashby v. State*,[57] to be persuasive. In *Ashby*, we refused to extend a coconspirator liability theory to minimum contacts for purposes of establishing personal jurisdiction. We declined to reach the issue, noting:

---

[53] *Id.*

[54] *Clune v. Alimak AB*, 233 F.3d 538 (8th Cir. 2000).

[55] *Id.*

[56] *Universal Capital Mgmt., Inc. v. Micco World, Inc., supra* note 52, 2011 WL 2347612 at *5.

[57] *Ashby v. State*, 279 Neb. 509, 779 N.W.2d 343 (2010).

> Due process for personal jurisdiction over a nonresident defendant requires that the plaintiff allege specific acts by the defendant which establish that the defendant had the necessary minimum contacts before a Nebraska court can exercise jurisdiction over a person. Without minimum contacts, a Nebraska court cannot exercise jurisdiction over [the defendant] without violating his right to due process. The difficulty with establishing personal jurisdiction based on an alleged conspiracy is that it merges the jurisdiction issue with the merits of the case.[58]

We do not revisit this decision. As such, we decline Nimmer's invitation to incorporate successor liability and contractual successor liability for minimum contacts for purposes of personal jurisdiction under these facts.

Finally, we reject Nimmer's assertion that GEM's legal counsel stipulated to Nebraska venue. In support of this contention, Nimmer relies on emails sent to him from Pafford. These emails include discussions for a proposed settlement upon Nimmer's withdrawal from legal representation. There is no indication that Nimmer accepted this offer. That the dispute was not settled prior to trial provides a basis for this court to find that Nimmer did not accept GEM's proposed settlement.

As established above, accepting Nimmer's allegations as true and reviewing the record in a light most favorable to Nimmer, we find that Nimmer's amended complaint and general allegations failed to show that GEM made substantial connections with Nebraska resulting in GEM's purposeful availment of Nebraska's benefits and protections. Nimmer's assignment of error is without merit.

### (d) Whether District Court Erred in Dismissing Nimmer's Complaint With Prejudice

Nimmer argues that the district court erred in dismissing his complaint with prejudice. GEM argues that a dismissal

---

[58] *Id.* at 532, 779 N.W.2d at 360-61.

with prejudice was appropriate because "Nimmer was given a chance to amend his complaint, and after full briefing on this amended complaint, the district court entered its order of dismissal with prejudice."[59]

In support of his argument, Nimmer cites *RFD-TV v. WildOpenWest Finance*,[60] in which RFD asserted that the district court erred in dismissing the case with prejudice. We stated:

> There is no statutory grant of judicial discretion to decide whether to dismiss with or without prejudice on a motion to dismiss for lack of personal jurisdiction. Thus, we find this issue to be a question of law. The Eighth Circuit has said that "a dismissal with prejudice operates as a rejection of the plaintiff's claims on the merits and res judicata precludes further litigation." However, the Full Faith and Credit Clause of the U.S. Constitution requires a court to recognize a judgment from another jurisdiction only if the court rendering the judgment had jurisdiction over the subject matter and parties. Thus, a dismissal for lack of personal jurisdiction, even a dismissal with prejudice, should not prevent RFD from pursuing its claims in an appropriate forum.

> On the other hand, a dismissal with prejudice would preclude RFD from filing a second suit with the same claims in a Nebraska court. . . . However, as noted by the Eighth Circuit in *Pohlmann v. Bil-Jax, Inc.*, [176 F.3d 1110 (8th Cir. 1999),] because personal jurisdiction is determined at the time a suit is commenced, it is possible that due to future events, this legal situation could change. Although it seems unlikely under the facts of this case, if, for example, appellees were to relocate to Nebraska, then personal jurisdiction over appellees in a subsequent suit could be proper in this state.

---

[59] Brief for appellee at 27.

[60] *RFD-TV v. WildOpenWest Finance, supra* note 5.

We also note that in this case, both parties agreed in briefs and in arguments before this court that the dismissal should have been without prejudice.[61]
For these reasons, we reversed the district court's opinion and modified the order to a dismissal without prejudice.

We agree that generally a trial court's dismissal of a claim for lack of personal jurisdiction must be without prejudice. This follows from the premise that a court lacking jurisdiction cannot adjudicate the merits of a claim.[62] Here, as in *RFD-TV*, it is possible that personal jurisdiction could be found in a subsequent lawsuit. But that does not mean that a dismissal for lack of jurisdiction can never have preclusive effect. If a subsequent suit presented no different circumstances, the same result would necessarily follow. Thus, in that sense, the dismissal could be described as "with prejudice." Generally speaking, it is better to adhere to the articulation of a dismissal without prejudice. For this reason, we find that the district court erred in dismissing the case with prejudice and its order is modified to a dismissal without prejudice.

## VI. CONCLUSION

For the foregoing reasons, the decision of the district court is affirmed as modified.

AFFIRMED AS MODIFIED.

WRIGHT, J., not participating in the decision.

---

[61] *Id.* at 329-30, 849 N.W.2d at 116-17.

[62] Cf. 20 Am. Jur. 2d *Courts* § 53 (2015).